BRUNNER, D. B. A. BRUNNER MEAT PACKING, ET AL., APPELLEES, *v.* RHODES, MAYOR, ET AL., APPELLANTS.

(No. 4730—Decided March 23, 1953.)

*Mr. Collis Gundy Lane*, for appellees.

*Mr. Richard W. Gordon*, city attorney, *Mr. Hugh K. Martin, Mr. J. Raymond Snowden* and *Mr. Wayne S. Gerber*, for appellants.

HORNBECK, J. This is an appeal on questions of law and fact from a judgment of the Common Pleas Court in favor of the plaintiffs.

The issues are drawn on an amended petition, the answer thereto, a supplemental petition, a second supplemental petition, a joint answer thereto, a reply and a supplemental reply. The supplemental pleadings were made necessary because of certain regulations of the defendants enacted subsequent to the filing of the amended petition.

By their pleadings, plaintiffs seek a declaratory judgment defining their rights under certain regulations providing for the inspection of slaughter houses, meat, and meat products. The plaintiffs are individuals, partnerships and corporations engaged in meat packing, the slaughter of meat animals, and the distribution and sale of the meat. All of them are affected and are required to pay the fees provided by the regulations.

The plaintiffs question the validity and, therefore, the enforceability of the several regulations involved sofar as they require payment of permit and inspection fees by plaintiffs. The contentions of the plaintiffs are set forth under four headings:

(1) The purported regulations of the board of health were not properly adopted and are, therefore, invalid.

(2) The board of health is without authority to impose fees for inspection which they have attempted to impose.

(3) The regulations generally are unreasonable, discriminatory, and usurp the legislative function.

(4) Plaintiffs are entitled to recover meat inspection fees paid by them.

Four regulations are involved. The first was dated March 31, 1947, and became effective May 1, 1947; the second was dated November 30, 1947, and became ef-

fective January 1, 1949; the third was dated March 10, 1950, and became effective on and after May 1, 1950; and the fourth was dated April 27, 1950, and became effective May 1, 1950.

It is urged that the first regulation is invalid because it was not read on three separate occasions nor was the reading on three separate occasions dispensed with by a three-fourths vote, and that it was not properly enacted as an emergency measure.

The second regulation is claimed to be ineffective because it was not read on three separate occasions nor was there any waiver of such requisite. It was not published and its purported effective date is contrary to the statute.

The third regulation is asserted to be invalid because it was not published and, although an emergency was claimed to exist in the preamble, there is no stating of an emergency or reasons therefor in a separate section and it purports to contain an effective date which was contrary to the legally effective date.

The fourth regulation is questioned in that, although an attempt was made to declare an emergency in section 26 of the regulation, no reasons were declared or set forth for the emergency. There was no publication, and it purported to be effective at a date which was contrary to law.

The authority of the defendant board of health to adopt orders and regulations and the procedure to be followed is set out in Section 4413, General Code:

"The board of health of a city may make such orders and regulations as it deems necessary for its own government, for the public health, the prevention or restriction of disease * * *. Orders and regulations not for the government of the board, but intended for the general public shall be adopted, advertised, recorded and certified as are ordinances of municipali-

ties * * *. Provided, however, that in cases of emergency caused by epidemic of contagious or infectious diseases, or conditions or events endangering the public health, such boards may declare such orders and regulations to be emergency measures, and such orders and regulations shall become immediately effective without such advertising, recording and certifying.''

It thus becomes necessary to determine how ordinances are adopted by municipalities as contemplated by Section 4413, General Code. This procedure is found in Section 4224, General Code, which, so far as pertinent, provides:

''The action of council shall be by ordinance or resolution, and on the passage of each ordinance or resolution the vote shall be taken by 'yeas' and 'nays' and entered upon the journal * * *. No * * * ordinance * * * of a general or permanent nature, or granting a franchise, or creating a right, or involving the ex-expenditure of money * * * shall be passed, unless it has been fully and distinctly read on three different days, and with respect to any such * * * ordinance * * * there shall be no authority to dispense with this rule, except by a three-fourths vote of all members elected thereto, taken by yeas and nays, on each * * * ordinance, and entered on the journal. No ordinance shall be passed by council without the concurrence of a majority of all members elected thereto.''

Provision for the adoption of emergency ordinances, in so far as pertinent, is found in Section 4227-3, General Code:

''* * * Emergency ordinances or measures necessary for the immediate preservation of the public * * * health * * * shall go into immediate effect. Such emergency ordinances * * * must, upon a yea and nay vote, receive the vote of two-thirds of all the members elected to the council or other body corresponding to the

council of such municipal corporation, and the reasons for such necessity shall be set forth in one section of the ordinance or other measure.''

There is no dispute that in the enactment of a regulation of the board of health other than an emergency regulation, the procedural requirements of Section 4224, General Code, must be followed, but it is urged by the defendants that the proviso in Section 4413, General Code, exempts the board from the observance of the procedural requirements of that part of the section preceding the proviso.

The first mention of emergency ordinances is found in 102 Ohio Laws, 521, enacted March 31, 1911. The emergency provision as now found in Section 4227-3, General Code, was enacted as an amendment to 102 Ohio Laws, 521, and became effective April 28, 1913. The proviso in Section 4413, General Code, is first found in the Hughes Act (108 Ohio Laws, Pt. 1, 236, 248, effective May 12, 1919), and later in the Griswold Act (108 Ohio Laws, Pt. 2, 1092, effective January 2, 1920). Thus, when the emergency proviso was carried into Section 4413, General Code, the Legislature acted with full appreciation of the emergency requirements as to the enactment of ordinances of municipalities, which legislation had then been effective for more than six years.

It will be noted that if the board would observe the requirements of the proviso in Section 4413, General Code, in enacting emergency legislation, it thereby would avoid the necessity of advertising, recording and certifying the regulation, but there is still left in the language of the earlier part of the section the obligation that regulations intended for the general public shall ''be adopted as are ordinances.''

The emergency provision of Section 4413, General Code, is a part of the general enactment investing the board with authority to make regulations and defining

procedure, mainly by reference. The proviso in this section is silent as to procedural requirements.

It was held in *Goodman* v. *City of Youngstown*, 24 Ohio Law Abs., 696, with reference to the enactment of a city ordinance:

"The mere statement that the ordinance is necessary for the preservation of the public peace, health and safety is but a conclusion of the council, without the statement of any reason therefor."

See, also, *Maloney* v. *Gutelius*, 30 Ohio Law Abs., 432, 2 Ohio Supp., 230.

Notwithstanding this holding, we believe that if either of the reasons authorizing an emergency regulation, or facts which require the conclusion that one of these reasons exists is found by the board of health, it will meet the requirements of the proviso in Section 4413, General Code. These conditions are either that an emergency exists which is caused by an epidemic of contagious or infectious diseases or by conditions or events endangering the public health. Observance of this requirement by the board will preclude the court from questioning the necessity that the regulation go into immediate effect. *Holcomb, Auditor of City of Massillon,* v. *State, ex rel. Coxey, Sr.*, 126 Ohio St., 496, 186 N. E., 99, paragraph three of the syllabus.

Let us examine the various ordinances in the light of the construction of Section 4413, General Code, which we have heretofore indicated. The first regulation, dated March 31, 1947, was stated to be effective May 1, 1947. One of the prime purposes of emergency legislation is that there is necessity that it become effective immediately. It was inconsistent with the emergency feature of the regulation to fix its effective date more than a month after its enactment. However, if it was an emergency, it may be held to have been effective when properly enacted.

It is urged by the defendants that this regulation

was properly enacted as ordinary legislation in that there was a compliance with the obligation that it be read on three different days and that it be published. The reading on three different days was mandatory to the enactment of an ordinary regulation. *Campbell v. City of Cincinnati,* 49 Ohio St., 463, 31 N. E., 606. But it is contended that compliance with the requirement as to the readings does not have to be entered on the record of the board. With this we agree. It is further claimed that proof of these readings is found in the stipulation. With this contention we cannot agree. The most that can be inferred from the stipulation is that the board had it under consideration and probably discussed it at three meetings but this is far from the requisite proof that it was read in its entirety at each and every one of these meetings. Proof of the readings of the regulation was susceptible of direct evidence which, it would seem, may have been forthcoming from some member or the secretary of the board, if it were a fact. The effective date of the regulation cannot be inferred from the stipulation as to the publication, nor does the record of the board show any vote to dispense with the readings of the regulation.

This regulation recites the reasons for the emergency and indirectly requires the conclusion that conditions endangering the public health exist, and it is declared to be an emergency regulation. It received the vote of all but one of the members of the board. We find that this regulation was procedurally valid.

The second regulation, dated November 30, 1948, does not purport to be an emergency measure nor was it adopted in the manner required for a regulation other than an emergency. This regulation differed from the first in that it fixed a minimum inspection fee of three dollars.

The third regulation, dated March 10, 1950, was

procedurally valid for the same reasons as the regulation of March 31, 1947.

The fourth regulation, dated April 27, 1950, is invalid. It does not meet the requirements of an emergency measure and was not published.

The second contention of plaintiffs is that the board of health was without authority to impose fees for inspection as provided in the regulations.

This contention is directed to that part of the regulations which impose upon packers and slaughterers of meat a fee for the services to be rendered in the inspection of their slaughter houses and the animals before and after killing.

The first regulation fixed the fees for inspection at 35 cents for each carcass of cattle and 15 cents for each carcass of other animals. The second regulation fixed the minimum fee for inspection at three dollars. Subsequent regulations reduced the charges for each carcass of cattle inspected to 25 cents and other animals to 10 cents.

It is the claim of plaintiffs that the extent to which the board may charge inspection fees is found in Section 4459, General Code, and that it has no authority to require payment by way of inspection fees from the plaintiffs upon any other theory.

Section 4459, General Code, in part, provides:

"The Board of Health shall keep for public inspection a record of the names, residences and places of business of all persons engaged in the sale of * * * meat, and may require permits, *after inspection*, to vend * * * meat to be renewed semi-annually, for which a charge of not more than 50 cents may be made." (Emphasis ours.)

The fee herein authorized is a permit fee, and that part of the section which we have italicized is convincing that it was not intended to include inspection fees. Manifestly, the cost of such services would be so

greatly in excess of one dollar per year as to make the payment of such sum entirely inadequate to cover the expense of inspection of carcasses of animals before and after slaughter, or of meat preparatory to retailing it to the consumer.

Much has been said pro and con as to the public character of the services rendered under the provisions of the regulations. It is true that they are and could be considered as of a public character for the purposes of raising the funds with which to pay for the services to be rendered by the terms of the regulations, but that fact does not preclude the conclusion that persons engaged in the slaughtering or vending of meat receive by inspection a service over and beyond that which inures to the benefit of the general public. This fact was recognized and inspection fees required to be paid by slaughtering establishments in the city of Dayton by a municipal ordinance, enactment of which was held to be within the police power of the city, in *City of Dayton* v. *Jacobs,* 120 Ohio St., 225, 165 N. E., 844.

The legislation under consideration in the *Jacobs case* was a municipal ordinance and does not reach or determine the question here presented, namely, the power of the board of health by regulation to exact inspection fees from slaughterers. The *Jacobs case* was decided almost 10 years after the enactment of the Hughes and Griswold Acts. In the *Jacobs case,* the court disposed of the contention also that the fee there prescribed was a tax and held that it was but an inspection fee intended to produce sufficient return to take care of the reasonable expenses of the inspection provided in the ordinance. The regulations here under immediate consideration were expressly designed to accomplish that purpose, but the *Jacobs case* affords no support for the authority of the board of health to fix and collect inspection fees.

What power then has the board of health under the applicable provisions of the Code? It is basic that the board of health, being a creature of statute, has only such powers as are expressly conferred upon it and those which may be fairly implied from the express powers granted. *State, ex rel. Hunt* v. *Hildebrant, Secy. of State*, 93 Ohio St., 1, 112 N. E., 138, affirmed, 241 U. S., 565, 60 L. Ed., 1172, 36 S. Ct., 708; *State, ex rel. Clark,* v. *Cook, Aud.*, 103 Ohio St., 465, 134 N. E., 655. A fair and reasonable doubt as to the existence of the power to enact an ordinance should be resolved against the city. *Ergo*, the same rule is applicable to a Board of Health. 62 Corpus Juris Secundum, 788.

Section 4458, General Code, provides:

"The board of health may appoint, define their duties and fix the compensation of, such number of inspectors of dairies, slaughter houses * * * meat * * * and such other persons as is necessary to carry out the provisions of this chapter."

Were there no other provision of the Code than that to which we have just referred it might with some plausibility be urged that the board, having been given the power to name inspectors of slaughter houses and of meat, would have the implied authority to implement these powers by a regulation which would finance such services. But the same act which includes Section 4458, General Code, also includes Section 4451, General Code, which provides:

"When expenses are incurred by the board of health *under the provisions of this chapter,* upon application and *certificate* from such board, the council shall pass the necessary appropriation ordinances to pay the expenses so incurred and certified. * * *." (Emphasis ours.)

Many appointments are authorized to be made in the chapter under the heading board of health, among

which are health commissioner, public health nurses, clerks, other persons and sanitary officers.

In *State, ex rel. Miller,* v. *Council of Massillon,* 2 C. C. (N. S.), 167, 14 C. D., 249, the salary of a health officer appointed by the board of health was held to be "expense incurred" under Section 2140, Revised Statutes, now Section 4451, General Code. This latter section was not affected by the Hughes and Griswold Acts. The appointment of inspectors for slaughter houses which were necessary to effectuate the regulations here under consideration may well be held to be "expenses incurred." This obligation of the city council to enact the necessary ordinances to produce the money to pay the expenses incurred by the board of health is almost as old as the legislation creating boards of health.

In 66 Ohio Laws, 200 *et seq.,* enacted in 1869, Section 325 of the Act provides:

"Where expenses shall be incurred by the board of health, under the provisions of this act, it shall be the duty of the council, upon application and certificate from said board of health, to pass the necessary appropriating ordinances to pay the expenses so *incurred* and *certified.*" (Emphasis ours.)

This act did not provide for the appointment of inspectors of slaughter houses and meat but did authorize the appointment of many other officers. On April 20, 1874 (71 Ohio Laws, 158, 160), a similar provision as to the payment of expenses by appropriation of council is found and, also, in this act in Section 318, page 160, the board of health is given authority to name sanitary officers, inspectors of milk and meat, market masters, provides for inspection of dairies, including the cows, cow stables, milk houses and milk vessels, the owners of which shall offer for sale milk within the corporate limits of the city. This legisla-

tion did not have application to cities of the first grade of first class but it does disclose the legislative purpose as to the source of payment for expenses incurred by boards of health of other cities.

In 95 Ohio Laws, 421 *et seq.*, effective May 7, 1902, is found a comprehensive act treating the subject of health. Therein, probably for the first time, is a section (Section 2139, page 433) authorizing the board of health to appoint inspectors of slaughter houses along with other inspectors, the appointment of which had theretofore been authorized. It is in this same section, and as a part of it, that provision is made for the issuance of semiannual permits as now provided by Section 4459, General Code. It is significant that in that act the words, "after inspection," as now found in Section 4459, General Code, do not appear. Section 2138, page 433 of that act provides also for the payment of expenses incurred by the board of health by appropriation ordinances enacted by the council. There clearly runs through all of this health legislation an intendment that the expenses incurred by boards of health of cities in carrying out their delegated duties shall be met by action of the council. This specific obligation being enjoined upon the council, it follows that the board of health has no implied power to raise such funds by collection of permit fees. This conclusion is further heightened by the Hughes and Griswold Acts, creating city health districts and general health districts.

The Hughes and Griswold Acts, creating these districts (Sections 1261-16 to 1261-43, General Code), set forth complete and comprehensive procedure controlling the fiscal policy of the general health districts but left the municipal health districts, in such matters, subject to the law relating to boards of health for municipalities. Sections 4404 to 4476, inclusive, General

Code, which sections, as we have heretofore indicated, though amended by the Hughes and Griswold Acts, in substantially the same form had long antedated these acts. It is of interest to note that in the sections relating to health districts, Sections 1261-16 to 1261-43, inclusive, General Code, but one, namely, Section 1261-16, General Code, has any application to a city health district.

It is inferable that, unless the letter of the statutes controlling the respective health districts requires a different construction, it would be the purpose of the state legislation that like procedure be followed in financing the public services which both health districts are authorized and required to perform. Especially is this true inasmuch as the Hughes and Griswold Acts made the health districts which they created agencies of the state government. *State, ex rel. Mowrer, v. Underwood, et al., Civil Service Commission of the City of Akron,* 137 Ohio St., 1, 27 N. E. (2d), 773.

In the provisions relating to general health districts there is a new section (Section 1261-40, General Code), which provides for an annual estimate of current expenses by the board of health of such districts. This estimate is to be made annually on or before the first Monday in April for the year beginning the first day of January next ensuing, and is to be *itemized* and *certified* to the county auditor and by him submitted to the budget commission. This provision requiring an annual budget of the expenses by the board of health of a general district, although much more detailed than Section 4451, General Code, is, in our judgment, practically the same in purpose and is convincing that it was the intent of the legislation that the expenses of neither municipal nor general health districts should be raised by them but should be referred

to the council and the budget commissioners respectively for allowance. Similar provision is made in Section 1261-40, General Code, where a general health district has been united with a city health district located therein.

It is urged by defendants that the provision of Section 4451, General Code, that the council shall pass the necessary appropriation ordinances to pay expenses incurred by the board upon "application" and "certificate" from the board, implies that there may be expenses incurred other than those to be certified. This language, heretofore italicized, has been employed throughout practically all the health legislation. We are of the opinion that it is the intendment of the statute that all expenses incurred by the city board of health, unless otherwise expressly provided, shall be paid by appropriation ordinances of the city council, and that such expenses, for the purpose of certainty, are required to be certified.

Several courts of the state have had questions under consideration similar, at least, to the one which we are now considering and have resolved them as we have determined the issue here. These cases are *Spangler, d. b. a. Pure Milk Dairy*, v. *Teeple* (unreported), case No. 32233, Common Pleas Court of Wood County, opinion by Judge Sloether; *Prudential Cooperative Realty Co.* v. *City of Youngstown,* 118 Ohio St., 204, 160 N. E., 695, and Judge Rutherford in this case in the Common Pleas Court.

Upon the third contention of plaintiffs that the regulations generally are unreasonable and discriminatory, we find against them.

The fourth contention is that the plaintiffs are entitled to recover meat inspection fees paid by them. This claim is met by the defendants with the charge that the fees were paid voluntarily. They cite *Ratter-*

*man, Treas.,* v. *American Express Co.,* 49 Ohio St., 608, 32 N. E., 754; *City of Toledo* v. *Buechele,* 19 C. C., 127, 10 C. D., 280; *State, ex rel. Pulscamp,* v. *Bd. of County Commissioners,* 119 Ohio St., 504, 164 N. E., 755; *Whitbeck, Treas.,* v. *Minch,* 48 Ohio St., 210, 31 N. E., 743. Plaintiffs, likewise, rely upon *Ratterman* v. *American Express Co., supra,* and *City of Toledo* v. *Buechele, supra.* Without analyzing these cases, we are satisfied to say that in our judgment the payments of the inspection fees by the plaintiffs with and after their notices that they were paid under protest were involuntary payments. This is true because of the provisions of the regulation under which the plaintiffs would have been denied the benefit of the inspection services had they not paid the prescribed fees and also would have been subject to prosecution and punishment under the penal provisions of the regulation.

It may be that because of our findings, plaintiffs, as a matter of law, are entitled to an order requiring the defendants to return the money paid to them as inspection fees under the ordinances. We are disposed to exercise whatever discretion we have in refusing to make such an order as to all sums paid under protest, first, because it would be futile, and, second, because it would not be equitable. The plaintiffs have received full value for the funds paid for inspections. However, the fees impounded by the decree of the Common Pleas Court will be ordered paid to the plaintiffs.

*Judgment accordingly.*

WISEMAN, P. J., and MILLER, J., concur.