[Cite as *State v. Stone*, 2012-Ohio-4755.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                  :

     Plaintiff-Appellee            :        C.A. CASE NO.   2011 CA 96

v.                          :        T.C. NO.   04CR185

JAMARR STONE              :       (Criminal appeal from
                                         Common Pleas Court)

     Defendant-Appellant     :

                                 :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the   12th   day of    October   , 2012.

· · · · · · · · · ·

LISA M. FANNIN, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
        Attorney for Plaintiff-Appellee

ANTHONY COMUNALE, Atty. Reg. No. 0062449, 130 W. Second Street, Suite 2050, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

· · · · · · · · · ·

DONOVAN, J.

      **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Jamarr Stone, filed December 8, 2011. Stone appeals from the trial court's decision denying his second petition for post-conviction relief. We hereby affirm the trial court's decision.

      **{¶ 2}**   Stone was indicted on March 15, 2004, on one count of murder, in violation of

R.C. 2903.02(A), with a firearm specification, and one count of tampering with evidence, in violation of R.C. 2921.12.   The action arose from the February 26, 2004 shooting of William G. Evans outside the Boris Nightclub, in Springfield.

{¶ 3}   Stone moved the court for an order permitting counsel to retain the services of an investigator, asserting that while there were no eyewitnesses to the shooting, there were "many witnesses" present at the bar who witnessed an altercation between Stone and Evans.   The court did not rule on the motion.   After he initially pled not guilty, Stone withdrew his pleas and pled guilty to murder, a felony of the first degree, and in exchange for his plea, the firearm specification and the tampering with evidence charge were dismissed.   The trial court sentenced Stone to 15 years to life on June 22, 2004.   Stone did not file a direct appeal.

{¶ 4}   On November 29, 2004, Stone a filed a pro se "Motion to Withdraw Guilty Plea [/] In Alternative Petition to Set Aside Judgment and Conviction," attached to which is Stone's affidavit and the affidavit of Andrea Carter, who identified herself as Stone's fiancee.   Stone averred that he received ineffective assistance of counsel in that his attorney failed to investigate potential witnesses to the shooting.   Stone further asserted that he advised his attorney that the nightclub where the shooting occurred maintained surveillance cameras.   Stone asserted that defense counsel failed to retrieve the surveillance tape.   Stone asserted that defense counsel also failed to pursue the motion regarding a private investigator.   Stone asserted that he was "coerce, manipulated and frighten into entering a guilty plea." (Sic).   Stone averred that certain witnesses' statements were conflicting and not credible.   In his supporting memorandum, Stone asserted that defense counsel was also ineffective for failing to file a motion to suppress.

{¶ 5}   The State did not file a response, and on March 16, 2005, Stone filed a motion for summary judgment.   On March 29, 2005, the trial court ordered the State to respond to the motion, and on April 20, 2005, the State filed "Respondent's Memo Contra to Post-Conviction

Relief." Also on April 22, 2005, Stone filed a pro se "Motion for Court to Proceed to Judgment on Defendant/Petitioner's Pleadings Alone." On May 9, 2005, Stone filed a "Motion to Dismiss/Disqualify Prosecution's Response Summary Judgment." On May 19, 2005, he filed a "Motion to Amend Petition by Leave of Court," in which he enumerated 20 separate "Claims," and he also filed a second "Motion to Withdraw Guilty Plea," in which he enumerated 16 "Claims." On June 16, 2005, Stone filed a second Motion for Summary Judgment, attached to which are the affidavits of Andrea Carter and her sister, Aquilla Carter, as well as 15 photographs that the Carters assert depict injuries to Stone's shoulder that resulted from his altercation with Evans. On August 5, 2005, Stone filed a motion for expert assistance and appointment of counsel. On November 28, 2005 Stone filed a "Motion to Render Decision."

{¶ 6} On March 8, 2006, the trial court issued a "Decision and Entry Denying Defendant's Motion to Withdraw Plea and Petition for Post-Conviction Relief." The court determined that while Stone asserted that he did not enter his guilty plea voluntarily, "he does not state facts establishing how that was so. Rather, Stone refers to inconsistencies in witness statements; that [defense counsel] did not hire a private investigator or personally interview witnesses; and that [defense counsel] did not file various pre-trial motions." Regarding the credibility of the affidavits and other evidentiary material submitted by Stone, the court noted that the judge considering the petition presided as trial judge and observed Stone and defense counsel, and that "the affidavits before the Court are those of the petitioner and relatives or friends; and each of Stone's assertions have the effect of recanting prior statements or are otherwise controverted by the record." The court cited the Crim.R. 11 colloquy between the court and Stone, during which Stone indicated that he discussed possible defenses with his counsel, was satisfied with counsel's representation, understood what had been placed on the record, had not been promised anything beyond what was on the record, had not been threatened, and that by pleading guilty he was admitting the truth of the facts as presented by the State. Further, the court noted that defense counsel advised the court that Stone agreed to plead

guilty on his own initiative. The court noted that, when given the opportunity to address the court at disposition, Stone demonstrated remorse and apologized for acting in a rage and taking Evans' life. Finally, the court concluded that a manifest injustice was not demonstrated, and that Stone was accordingly precluded from withdrawing his plea.

{¶ 7} This Court affirmed the trial court's decision on Stone's appeal. *State v. Stone*, 2d Dist. Clark No. 06CA0026, 2007-Ohio-801. Therein, this Court noted in part, regarding the alleged witnesses to the altercation between Stone and Evans, that "Stone does not indicate what help the witnesses might have provided, though his contentions suggest that they might support a self-defense claim." *Id*., ¶ 7.

{¶ 8} Stone filed his second "Petition for Post Conviction Relief" on May 3, 2011. Therein, he asserts that "after several years of further investigation, Petitioner has secured a number of affidavits for this Court's consideration." Five affidavits are attached to the petition. According to the affidavit of Kendra Compton, on the night of the incident, she and Angela Jackson entered the Boris Nightclub together at "nearly the same time" as Stone. Upon arrival, Compton avers, the bartender directed Jackson to leave the premises, because she had recently engaged in a fight there with Niquela Portis, who was also then present at the bar. According to Compton, Jackson and Stone asked the bartender to allow Jackson to remain at the bar, "but when the bartender explained that [Jackson] couldn't be seen on the security camera by his boss, Jamarr Stone gave up and took off towards the restroom." Compton avers that the bartender did allow Jackson to remain, and when Stone returned from the area of the restroom, he looked worried. Seconds later, according to Compton, Evans, who appeared angry and drunk, approached and began to yell at Stone. Compton states that Evans had his hand in his pocket, "giving the impression that he had a weapon." Compton described Evans as "extremely aggressive" in threatening Stone, and she described Stone as scared and silent. According to Compton, "Stone just stood in there accepting it." When Stone attempted to use his cell phone, Compton states that Evans knocked it from Stone's hand. Compton avers that

Stone asked her to pick it up, and she did so, handing it back to Stone. According to Compton, Stone placed the phone in his pocket and turned his back on Evans, who then "grabbed Jamarr Stone off of his feet and began beating him up."

{¶ 9} Compton avers that Stone broke free and ran outside, and that Evans and Darrin Johnson chased him. According to Compton, two to three minutes later, the bartender ordered her and Jackson to leave the premises. Shortly thereafter, Compton states that Johnson approached Jackson and Camille Burton and "started choking them," accusing all three women of possessing the weapon that was used to shoot Evans. Compton states that Evans searched Burton and Jackson, but found no weapon. Finally, Compton avers as follows:

> During the entire time when Jamarr Stone was going to trial both me and [Jackson] received threats from William Evans['] family (including his brother Darrin Johnson) and even the cops. Whereas William Evans family were placing threats on our lives and our family's lives, the cops were threatening jail time if we helped Jamarr out. In fact, [they] had me plea guilty to a charge associated with the disposal of the weapon and promised me probation. I wanted to fight the charge, but I had seen how rough it was on Jamarr Stone, so I took the deal.

{¶ 10} According to the affidavit of Camille Burton, she "ran into" Stone on the date of the incident, and they decided to go to a club called "The Spot" in Springfield. Burton avers they were accompanied by Stone's brother, Eric Stone, Jackson and Compton. The group then decided to go the Boris Nite Club, and Eric Stone rode with Burton, Jackson and Compton rode together, and Stone traveled alone. Burton avers that they arrived in the parking lot at the same time, and she states that she and Eric Stone remained in her car while the others went inside. After five minutes, according to Burton, Stone ran from the club to her car and pounded on her window and "snatched" at her door handle. She stated that Stone was "shaken up, and he even looked to be hurt." According to Burton, Eric Stone got out of the car and ran with his brother to Stone's vehicle. When

the men were out of sight, Burton avers that she heard several gunshots. She states that shortly thereafter, the Stones got into Jamarr's vehicle and fled. After the men left the parking lot, Darrin Johnson ran from the direction of Jamarr's vehicle and grabbed Burton and Jackson by the throat and held them until the police arrived, according to Burton's affidavit. Burton avers that she heard from "others" in the club that Johnson and Evans "were messing with Jamarr Stone that night because Jamarr Stone was an 'out-of-towner.'" Finally, Burton avers that she intended to testify at Stone's trial, but that she was "threatened into not doing so by the cops and Darrin Johnson."

{¶ 11} According to the affidavit of Angela Jackson, she witnessed Evans physically assault Stone at the Boris NightClub. Her affidavit mirrors Compton's account. Her affidavit concludes that she "was threatened by the cops with charges of complicity to commit murder, also charges dealing with the disposal of a weapon used to shoot William Evans, which I had never seen. I was also upset with the judicial system when I attempted to inform the detectives the truth about what happened on 2-26-04 and they told me that I was lying and charged me with perjury." Jackson also averred that Darrin Johnson threatened her.

{¶ 12} Niquela Portis' affidavit states that she was sitting at the bar when Stone arrived, and her affidavit is consistent with that of Jackson and Compton regarding the events that occurred inside. Portis asserts that "a lot of the people that were witnesses to this event didn't tell the entire truth" because they were either friends with Evans or Johnson, or employees of the bar. She does not identify any of these witnesses.

{¶ 13} The remaining affidavits do not provide eyewitness testimony of the incident. Christopher Ogletree avers that Portis told him about "the assault against Jamarr Stone," and that, while he was not involved in the altercation, he "received threatening phone calls (from the guy who got shot family) on my cell phone, and house phone, and even had my residence * * * shot at." Jarron U. Early-Tabor avers that Stone is "a longtime friend of my family," and that he was "told that

there was a woman bartender present this night, who was intimate with one of William Evans family members, and that she disposed of the security camera tape to cover up William Evans['] and Darrin Johnson's malicious acts against Jamarr Stone." Garrett Dolby avers that he is Evans' first cousin, and that Evans "liked to go out drinking and fighting all the time," and that Dolby has "heard of my cousin's (Darrin Johnson) and others threat[en]ing witnesses that would speak on the behalf of Jamarr Stone * * * ."

{¶ 14} On May 11, 2011, the State filed a motion to dismiss Stone's petition, and Stone filed a response. In overruling Stone's petition, without a hearing, the court noted that Stone pled guilty to murder, and that his first petition for post conviction relief had been dismissed. The court determined that Stone's successive petition was governed by R.C. 2953.23(A)(1)(a) and (b), and that Stone "fails to show that he was unavoidably prevented from discovery of the facts upon which he must rely to present the claim for relief; nor does he set forth a claim of a new federal o[r] state right recognized by the United States Supreme [Court] and applied retroactively to persons in the petitioner's situation. R.C. 2953.23(A)(1)(a)." Finally, the court concluded that Stone's conviction is the result of a counseled plea of guilty, and he accordingly cannot establish that but for constitutional error at trial, that no reasonable factfinder would have found him guilty of murder.

{¶ 15} Stone asserts one assignment of error herein as follows:

"THE TRIAL COURT ABUSED ITS DISCRETION BY DISMISSING APPELLANT'S PETITION."

{¶ 16} Stone asserts that with the support of a private investigator and "some due diligence in investigating the incident, the witnesses would have been found and the threats of Johnson and company would not have stood unchallenged. An investigator would have addressed the threats made and their fears and advised them of the protections afforded to witnesses by the justice system." Finally, Stone asserts, "the witnesses' testimony, consistent with the affidavits, would have provided

very strong evidence of self defense or voluntary manslaughter."

{¶ 17} "The post-conviction relief process is a civil, collateral attack on a criminal judgment. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905, 1999-Ohio-102." *State v. Johnson*, 2d Dist. Greene Nos. 09-CA-16, 10-CA-07, 2010-Ohio-2838, ¶ 9. R.C. 2953.23 provides in relevant part as follows:

(A) Whether a hearing is or is not held on a petition filed pursuant to section 2953.21 of the Revised Code, a court may not entertain a petition filed after the expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner unless division (A)(1) or (2) of this section applies:

(1) Both of the following apply:

(a) Either the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognizes a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted * * * .

"'The phrase "unavoidably prevented" means that a defendant was unaware of those facts and was unable to learn of them through reasonable diligence.' * * * ." *State v. Rainey*, 2d Dist. Montgomery No. 23851, 2010-Ohio-5162, ¶ 13.

{¶ 18} As this Court has previously noted:

In addressing a petition for post-conviction relief, a trial court has a gatekeeping role as to whether a defendant will receive a hearing. * * * A trial court must dismiss a petition for post conviction relief without a hearing "where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." [*Calhoun*, paragraph two of the syllabus] * * * . *State v. Wells*, 2d Dist. Champaign No. 2010 CA 5, 2010-Ohio-3238, ¶ 11.

{¶ 19} The Ohio Supreme Court has held that, in postconviction relief proceedings, "'a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact.'" *Johnson*, ¶ 46, quoting *Calhoun*, at 284. Further, the "'trial court may, under appropriate circumstances in postconviction relief proceedings, deem affidavit testimony to lack credibility without first observing or examining the affiant.' *Id*." *Id.*

{¶ 20} This Court has previously noted:

In evaluating the credibility of affidavits in post-conviction proceedings, a court should consider all relevant factors, including "(1) whether the judge reviewing the post-conviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony." * * * "Depending on the entire record, one or more of these or other factors may be sufficient to justify

the conclusion that an affidavit asserting information outside the record lacks credibility.  Such decision should be within the discretion of the trial court.  A trial court that discounts the credibility of sworn affidavits should include an explanation of its basis for doing so in its findings of fact and conclusions of law, in order that meaningful appellate review may occur."  *Johnson*, ¶ 47, quoting *Calhoun*.

**{¶ 21}**     Finally, this Court has noted:

[*Calhoun*] is concerned with manufactured grounds for post conviction relief involving propositions which the record shows are lacking in foundation.  A Court is not then required to proceed beyond the face of the affidavits offered in support of the grounds for relief alleged, and may reject the affidavits and dismiss the petition.  However, *Calhoun* does not authorize that result because the court intuits that the affiants are not worthy of belief.  Instead, the court must proceed to determine whether substantive grounds for relief are objectively shown, and if they are sufficient to hold a hearing.  *State v. Thrasher*, 2d Dist. Greene No.  06CA0069, 2007-Ohio-674, ¶ 32.

**{¶ 22}**     We review the trial court's dismissal of Stone's petition for an abuse of discretion.  *Wells*, ¶ 11.  As the Supreme Court of Ohio determined:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable.  (Internal citation omitted).  It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision.  It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.

*AAAA Enterprises, Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 23} Having thoroughly reviewed Stone's petition and the accompanying affidavits, we agree with the State that Stone has not demonstrated that he was unaware of and accordingly unavoidably prevented from discovering the facts upon which he relies, namely that Evans assaulted him and then chased an injured Stone out of the bar, supporting the inference that Stone acted in self-defense. As the State asserts, the same judge considering Stone's successive petition presided as the trial judge and observed Stone and defense counsel during the plea proceeding. It is clear that the identities of the witnesses to the altercation inside the bar were known to Stone at the time of the shooting. Stone was in the company of Compton, Burton and Jackson when the altercation occurred, and as his friends, they have an interest in the success of his petition (as does longtime friend Earley-Tabor). Reasonable diligence would have located these witnesses for trial. The affidavits of Compton, Burton and Jackson recite the identical scenario of being "threatened by the cops," as well as by Darrin Johnson. The affidavits further rely upon hearsay regarding not only the threats the witnesses received, but also, Burton averred that she heard from "others" in the bar that Johnson and Evans targeted Stone because he was from out of town. Portis' assertion that several witnesses did not tell "the entire truth" because of their relationships with Evans and Johnson, or employees of the bar, is unsupported speculation.

{¶ 24} The affidavits of the non-witnesses also rely on hearsay. Ogletree relies upon what Portis told him regarding the incident and not his personal knowledge. Earley-Tabor avers that he "was told" that a "woman bartender" disposed of the security tape. Dolby averred that he "heard" that Johnson and "others" were threatening witnesses.

{¶ 25} Finally, Stone entered a counseled plea of guilty, and he did not proceed to trial to claim self-defense, and to do so now contradicts Stone's guilty plea. Further, as the trial court noted

in dismissing Stone's first petition, a review of the transcript of Stone's plea reveals that he advised the court that he discussed any possible defenses with his attorney, and he indicated that he was satisfied with defense counsel's representation. He also stated at his plea hearing that he had not been threatened, and he further indicated that he understood that he would have the right to subpoena witnesses to appear on his behalf. Stone also stated that he admitted the facts as presented by the State, namely that Stone shot Evans outside the Boris Nightclub. At sentencing, the transcript reflects that, after Evans' mother addressed the court, Stone stated, in part, "I'm sorry for acting in a rage and taking your son's life," and the affidavits of the eyewitnesses, stating that Stone was scared and fleeing from Evans, are controverted by the record and accordingly lack credibility. Finally, since Stone entered a counseled guilty plea, R.C. 2953.21(1)(b) does not apply.

{¶ 26} Since Stone failed to show that he was unavoidably prevented from the discovery of the facts upon which he relies for relief, and since he does identify a new and retroactive federal or state right, recognized by the United States Supreme Court, upon which his claim is based, we conclude that the trial court did not abuse its discretion in dismissing Stone's petition without a hearing. The judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J. and VUKOVICH, J., concur.

(Hon. Joseph J. Vukovich, Seventh District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Lisa M. Fannin
Anthony Comunale
Hon. Richard J. O'Neill