[Cite as *Mack v. Toledo*, 2019-Ohio-5427.]

## IN THE COURT OF APPEALS OF OHIO
### SIXTH APPELLATE DISTRICT
### LUCAS COUNTY

| | | |
|---|---|---|
| CHERYL MACK, et al. | : | |
| | : | |
| Plaintiffs-Appellees | : | Appellate Case No. L-19-1010 |
| | : | |
| v. | : | Trial Court Case No. CI17-4676 |
| | : | |
| CITY OF TOLEDO, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellants | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 31st day of December, 2019.

. . . . . . . . . . .

ANDREW R. MAYLE, Atty. Reg. No. 0075622 and RONALD J. MAYLE, Atty. Reg. No. 0030820, P.O. Box 263, Perrysburg, Ohio 43552
    Attorneys for Plaintiffs-Appellees

JEFFREY B. CHARLES, Atty. Reg. No. 0064514, City of Toledo Law Department, One Government Center, Suite 2250, Toledo, Ohio 43604
    Attorney for Defendant-Appellant, City of Toledo

KEVIN A. PITUCH, Atty. Reg. No. 0040167 and EVY M. JARRETT, Atty. Reg. No. 0062485, Assistant Prosecuting Attorneys, Lucas County Prosecutor's Office, 711 Adams Street, Second Floor, Toledo, Ohio 43604
    Attorneys for Defendants-Appellants, Toledo-Lucas County Health District

TABITHA STEARNS, Atty. Reg. No. 0095218, 1867 West Market Street, Akron, Ohio 44313
    Attorney for Amicus Curiae, Board of Health of the Summit County Combined General Health District

HEATHER L. HALL, Atty. Reg. No. 0079303, 525 Jefferson Avenue, Suite 300, Toledo, Ohio 43604

        Attorney for Amicus Curiae, Advocates for Basic Legal Equality, Inc., Community Legal Aid Services, Legal Aid Society of Cleveland, Legal Aid Society of Columbus, Legal Aid Society of Southwest Ohio, and Southeastern Ohio Legal Services

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} This case involves a permanent injunction granted to prohibit enforcement of a municipal lead ordinance enacted by the City of Toledo. The Plaintiffs-Appellees are Cheryl Mack and Property Investor's Network, Inc. ("PIN"), and the Defendants-Appellants are the City of Toledo ("City") and the Toledo-Lucas County Health District ("District").[1] According to Appellants, the trial court erred in granting Appellees' partial motion for summary judgment and in overruling Appellants' motions for judgment on the pleadings. Specifically, Appellants contend that the trial court erred in concluding that R.C. 3709.28 does not authorize the District to enforce the City's lead ordinance. Appellants further contend that the trial court erred in finding that the lead ordinance violated the Equal Protection Clause of the Ohio Constitution because it applied to some rental properties and family child care homes while failing to apply to other rental properties, and because the definition of "Owner" rendered the classifications of property irrational. Finally, the City contends that the trial court erred in awarding attorney fees against it pursuant to R.C. 733.61.

{¶ 2} We have also received amicus curiae briefs from the Board of Health of Summit County Combined General Health District (Summit), and from Advocates of Basic

---

[1] The parties will be referred to collectively as Appellants and Appellees.

Legal Equality, Inc., Community Legal Aid Services, the Legal Aid Society of Cleveland, the Legal Aid Society of Columbus, Legal Aid Society of Southwest Ohio, and Southeastern Ohio Legal Services (collectively, "Legal Aid"). The briefs from Summit and Legal Aid were filed in support of the City and the District, and we thank them for aiding our consideration of this case.

{¶ 3} For the reasons that will be discussed, the judgment of the trial court will be reversed in part and affirmed in part, and this cause will be remanded for reconsideration of the amount of attorney fees, if any, to be awarded to Appellee, Mack, under R.C. 733.61. First, the trial court erred in concluding that the District lacked authority under R.C. 3709.281 to enforce the City's lead ordinance. We conclude R.C. 3709.281 is ambiguous, requiring interpretation, and it is not an unlawful delegation of the City's legislative authority. Instead, a reasonable interpretation of the statute is that the legislative authority, on the City's behalf, may contract with the District to perform services, like enforcing the lead ordinance, for the City.

{¶ 4} The trial court further erred by concluding that the classifications of properties subject to the lead ordinance violate equal protection. The classifications are rationally related to the ordinance's goal, which is to help prevent lead poisoning in the City. However, the trial court did not err in finding that the definition of "Owner" in the ordinance violates equal protection. This definition is so broad that it renders the ordinance's classifications unworkable and irrational. Finally, because judgment is now being rendered only partially, rather than totally, in favor of Appellees, the trial court should reconsider what, if any reasonable compensation should be awarded for attorney fees.

## I. Facts and Course of Proceedings

{¶ 5} All the facts in this case are undisputed. In April 2017, the Toledo City Council passed Ord. 167-17, which amended Toledo Municipal Code ("TMC") Chap. 1760 ("Registration of Lead Safe Residential Rental Units").[2] Section 1760.01 stated that:

It is the policy of the City of Toledo to help prevent the poisoning of its residents by requiring that the presence of deteriorated paint, bare soil and lead dust on the interior and exterior of pre-1978 residential structures be identified and correctly addressed in accordance with federal, state, and local laws, regulations and guidelines in order to prevent potential human exposure to lead hazards. An analysis of the risk assessments conducted in Toledo by the Health Department indicates that the majority of lead poisoning of children occurs in rental properties that are either single-family homes or four (4) units or less. All fees and fines generated under this Chapter shall be transferred to the Health Department to be used for the administration, implementation, and enforcement of this Chapter.

{¶ 6} Section 1706.02 further provided that:

(a) It is a violation of this Chapter to allow the following conditions - to exist in a "Residential Rental Property or a Family child Care Home": (1) "Deteriorated Paint Condition," (2) "Lead Dust Condition," or a (3) "Bare Soil Condition," as defined in section 1760.04. Every Owner of Residential

---

[2] Unless otherwise indicated, all references to Chapter 1760 refer to Ord. 167-17, which was passed on April 18, 2017. According to the record, Chapter 1760 was initially enacted in August 2016. Joint Stipulations No. 7 and Ex. E, p. 1. However, for purposes of this litigation, the relevant version is the one passed in April 2017.

Rental Property shall maintain such property free from these conditions. Once identified, the condition is to be remedied in accordance with the requirements of this Chapter. Termination of occupancy of any such Residential Rental Property shall not constitute compliance with the requirements of this Section.

(b) No Owner, Agent, real estate agent or broker, company, or any person or persons shall rent, lease, sublease, let, or otherwise allow the occupancy of any Residential Rental Property, or provide child care services in a Family Child Care Home, as defined in this Chapter, constructed prior to 1978 and which is subject to this Chapter, whether such use, or occupancy is temporary or permanent, unless a "Lead-Safe Certificate" has been issued for such Property.

{¶ 7} In order to obtain such a certificate, an owner was required to file an application and a "Lead Safe Report" issued by a local lead inspector within six months after the application was filed. The owner was also required to pay a $45 filing fee. The length of a certificate was three years, six years, or 20 years, depending on whether the property failed or passed an initial visual and dust wipe inspection, had undergone lead abatement, or had been determined not to contain lead-based paint. TMC 1760.03.

{¶ 8} A "Dwelling Unit" was defined as:

(1) any residential unit constructed as a single family home and built prior to 1978, and (2) any residential unit constructed as a duplex and built prior to 1978, (3) any residential unit, or other unit modified to be a residential unit consisting of between one and four residential units including

all of the following:

    (a)   The interior surfaces and all common areas of the dwelling unit;

    (b)   Every attached or unattached structure located within the same lot line as the dwelling unit, that the owner or manager considers to be associated with the operation of the dwelling unit, including garages, play equipment, and fences; and

    (c)   The lot or land that the dwelling unit occupies.

TMC 1760.04(a)(6).

**{¶ 9}** For the definition of "Owner," TMC 1760.04(20) incorporated the definition of "Owner" in TMC 1726.01.   This definition was "any of the following":

    (1)   Any person, corporation, limited liability company, partnership, limited partnership, limited liability partnership, or any shareholder, officer, trust, trustee, partner, agent or employee of any of the above who has care, custody, control or charge of a premises or part thereof, has legal title to the premises, or has done any act to maintain or operate the premises.

    A.   "Maintaining or operating the premises" shall include without limitation, entering into a public utility contract, obtaining a building or demolition permit or obtaining any other permit or license relating to the premises.

    (2)   Any operator of a premises.

TMC 1726.01(b) (Ord. 539-15, enacted on Nov. 10, 2015).

**{¶ 10}** An "Operator" was further defined as:

    (1)   Any person who has charge, care of or control of premises or a

part thereof whether with or without the knowledge and consent of the owner.

> (2)   Any person who alone or jointly or severally with others shall have legal or equitable title to any premises with or without accompanying actual possession therefrom or shall have charge, care or control of premises as owner or agent of the owner, or as executor, executrix, administrator, administratrix, trustee, receiver or guardian of the estate or as a mortgagee in possession.

> (3)   Any person who as a lessee subletting or reassigning any part or all of any premises shall be deemed to be a co-owner with the lessor and shall have joint responsibility over the portion of the premises sublet or assigned by such lessee.

TMC at 1726.01(c).

{¶ 11} TMC 1760.05(a) further provided that for purposes of Chap. 1760, "all paint on the interior or exterior of any residential building on which the original construction was completed prior to January 1, 1978, shall be presumed to be lead-based."  This presumption could only be rebutted "by obtaining a certification from a lead-based paint inspector or risk assessor that the property has been determined through a lead-based paint inspection conducted in accordance with the federal regulations at 40 CFR 745.227(b) not to contain lead-based paint."   TCM 1760.05(b).

{¶ 12} After analyzing each census tract in the city using public health data, which included all reported cases of child lead poisoning over the past five years, and census and residential parcel information, the City decided which rental properties posed the

greatest danger of lead exposure. TMC 1760.15(a). The City then required dwelling units in specific census tracts to comply with the lead-safe certificate requirement by one of three dates: June 30, 2018; June 30, 2019, or June 30, 2020. After June 30, 2020, all "dwelling units" within the geographical limits of the City were required to comply. *Id*. Failure to comply by the deadlines subjected "any" violator to a $50 per day administrative fee per dwelling unit, up to a maximum penalty of $10,000 per year per dwelling unit. *Id*. at 1760.15(b).

{¶ 13} The ordinance also authorized the Commissioner of the Health Department and/or his or her designee "to enter on and into and inspect all premises, dwellings, dwelling units and accessory buildings, subject to the provisions of" Chapter 1760, "and in accordance with the right of entry defined in Toledo Municipal Code Section 1303.0900 for the purpose of determining compliance with the provisions of" Chapter 1760." TMC 1760.08.

{¶ 14} On June 13, 2017, the City and the District executed an agreement to enforce Chapter 1760 of the Municipal Code. Joint Stipulations, No. 7 and Ex. E at p. 1. The agreement was signed by the Health Commissioner for the District and the Mayor of Toledo. Ex. E at pp. 2-3. Under the agreement, the City and District stated that they desired the District to "have all powers necessary or incidental thereto to perform the duties listed in Chapter 1760 and facilitate its enforcement." *Id*. at p. 1. The parties also stated that they were entering into the agreement "pursuant to Ohio Revised Code Section 3709.281." *Id*. Under the agreement, the District was to use the filing fees required by Section 1760.03(a)(3) to pay its expenses in enforcing Chapter 1760. Furthermore, because the District was already incurring expenses at that time, the City

agreed to provide $90,000 to pay or offset those expenses.   *Id.*

{¶ 15} As part of the agreement, the parties stated that the District would "perform the duties listed in Chapter 1760 of the Toledo Municipal Code" and "enforce its requirements on Residential Rental Properties and Family Child Care Homes."   *Id.*   The District was also given the right to petition any court to seek relief needed to enforce Chapter 1760, including to collect fines assessed under TMC 1760.15.   *Id.*   The agreement was to be effective from May 25, 2017 through December 31, 2022, with automatic renewal beginning on the latter date, and continuing every five years thereafter, unless either party gave written notice of withdrawal more than one year prior to the current term's expiration date.   *Id.* at p. 2.

{¶ 16} In an attempt to resolve the alleged unconstitutionality of the ordinance before the 2018 deadline, Appellees sent correspondence on October 23, 2017, to Adam Loukx, the City's law director, asking that he file litigation by October 30, 2017, to enjoin the lead ordinance.   Joint Stipulations, No. 1, Ex. A, pp. 1 and 3.   In response, Loukx stated that while his review of Appellees' letter gave him "the initial impression that the arguments raised therein [were] meritless," he would need additional time to adequately research the issues and weigh whether action was warranted.   *Id.* at No. 2, Ex. B, p. 1. Loukx, therefore, asked for two weeks, or on or before November 7, 2017, to respond to the request.   *Id.*    Loukx did not respond further, nor did he file a complaint or a request for an injunction.   Joint Stipulations, No. 3.

{¶ 17} On November 2, 2017, Appellees filed a complaint for permanent injunction against the City and the District.   Mack alleged that she was a taxpayer, resident, and real estate investor in the City.   PIN alleged that it was a "non-profit trade group

consisting of substantial investors in the Toledo rental market." Complaint at ¶ 6. PIN further alleged that its "members formed the group to protect their investments in Toledo by maintaining and attracting quality investors and property managers into the Toledo market," and that "[a]s a consequence, Toledoans have good choices in the residential market for single-family homes, duplexes, small apartment complexes, and other small-scale housing units." *Id.*

{¶ 18} PIN and Mack further contended that they were subject to the lead ordinance, that the ordinance was causing uncertainty in the Toledo rental market, and that the ordinance was unconstitutional on various grounds. *Id.* at ¶ 9, 11, 12, 13, and 22-34. These grounds included that the District had limited powers by statute and did not have the power to be a licensing agency for residential housing units; that the City's attempt to vest the District with powers violated the Ohio Constitution, Article II, Section 1; that the City Council violated R.C. 3709.281 because this statute only allowed the City Council to delegate its legislative power to the District, not executive or administrative powers; that the agreement was a nullity because it occurred after enactment of an unconstitutional ordinance; and that the classifications the ordinance created violated the Ohio Constitution, Article I, Section 2. Appellees, therefore, asked the court to permanently enjoin enforcement of the ordinance and to award them attorney fees pursuant to R.C. 733.61.

{¶ 19} After filing answers to the complaint, Appellants filed motions for judgment on the pleadings in December 2017. In December 2017, Appellees then filed a motion for partial summary judgment against the District. Further memoranda concerning these motions were filed in January and February 2018.

{¶ 20} In the meantime, the Toledo Lead Poisoning Prevention Coalition (TLPPC), a community organization with a mission of reducing the number of children who were subject to lead poisoning in the community, and Latoya Jenkins, the parent of a child who had been poisoned by lead, filed a motion for intervention as of right and permissive intervention. In March 2018, the trial court denied the motion, concluding that these parties did not have an unconditional right to intervene under Civ.R. 24(A)(2) because they did not have a legal interest, and had also failed to show that Appellees and their counsel were inadequate to represent their interests. Additionally, the court concluded that permissive intervention under Civ.R. 24(B) was unwarranted because TLPPC and Jenkins failed to cite a statute giving them a conditional right to intervene, and the collateral issues they wished to raise would exceed the narrow legal issue that Appellees had raised. Furthermore, due to the fast-approaching deadline for implementing the lead ordinance, the court concluded that disposition of collateral issues would unduly delay or prejudice adjudication of the rights of the original parties.

{¶ 21} In late May 2018, Appellees filed a motion for preliminary injunction, and the court set the matter for a hearing on June 15, 2018. Before the hearing, the parties filed memoranda, as well as joint stipulations with attached exhibits. On June 18, 2018, the trial court filed an opinion and entry granting the motion for preliminary injunction. In its entry, the court noted that the parties had agreed that no evidentiary hearing was required and had presented oral arguments at the hearing. June 18, 2018 Opinion and Journal Entry, p. 1.[3]

---

[3] We have not received a numbered docket sheet or a copy of the record. References, accordingly, will be made to the online docket in this case, which contains copies of documents filed in the trial court. Courts may appropriately take judicial notice of judicial

{¶ 22} In its decision, the court found that Appellees had standing. *Id.* at p. 2. The court further agreed with Appellees that R.C. 3709.281 was unambiguous and that because the City Council only had legislative authority, it was not permitted by statute to delegate non-existent administrative or enforcement powers to the District. *Id.* The court further held that the ordinance violated Ohio's Equal Protection Clause because the classifications among property owners were not rationally related to the ordinance's stated presumptions and purposes. *Id.* at p. 3. In addition, the court concluded that under traditional factors applying to granting preliminary injunctions, Appellees were likely to succeed on the merits, that they would be irreparably harmed absent a preliminary injunction, that no parties would be harmed by a preliminary injunction, and that granting an injunction was in the public's interest. *Id.*

{¶ 23} Subsequently, on July 20, 2018, the trial court granted Appellees' partial motion for summary judgment, overruled Appellants' motions for judgment on the pleadings, and permanently enjoined the District's enforcement of the lead ordinance. Although the court's decision was significantly more detailed with respect to the legal discussion, the decision was based essentially on what had been described in the preliminary injunction ruling. Shortly after the permanent injunction decision was issued, Appellees filed a motion for attorney fees pursuant to R.C. 733.59, and the court set a hearing for August 30, 2018.

{¶ 24} However, before the hearing could take place, Appellants filed notices of

opinions and public records that are accessible via the internet. *E.g., State ex rel. Everhart v. McIntosh*, 115 Ohio St.3d 195, 2007-Ohio-4798, 874 N.E.2d 516, ¶ 10; *State v. Bevers*, 2d Dist. Montgomery No. 27651, 2018-Ohio-4135, ¶ 13; *State ex rel. Brime v. McIntosh*, 10th Dist. Franklin No. 19AP-70, 2019-Ohio-4019, ¶ 28.

appeal with the Sixth District Court of Appeals. The court of appeals then dismissed the appeal for lack of a final appealable order, based on the further action needed on the request for statutory attorney fees. *See Mack v. Toledo*, 6th Dist. Lucas No. G-4801-CL-0201801164-000, pp. 2-3 (Oct. 23, 2018).

{¶ 25} After the case was remanded, the trial court awarded Mack $35,000 in attorney fees in January 2019. Appellants again appealed, and the trial court granted a stay of the attorney fee order pending final resolution of the matter in all courts with jurisdiction. In March 2019, the case was assigned to the current panel, to preside in the Sixth District Court of Appeals. All parties have filed briefs, and the case is ready for resolution.

## II. Alleged Error in Granting Partial Summary Judgment

{¶ 26} The sole assignment of error, asserted by both the City and the District, states that:

> The Common Pleas Court Committed Prejudicial Error When It Granted Appellees' Motion for Partial Summary Judgment and When It Overruled Appellants' Motions for Judgment on the Pleadings.

### A. R.C. 3709.281 and Unconstitutionality of the Lead Ordinance

{¶ 27} Appellants present two main arguments. The first is that the trial court erred because R.C. 3709.281 contains broad language that would let the District enforce the lead ordinance.

{¶ 28} In concluding that Appellees were entitled to partial summary judgment on

their request for a preliminary injunction, the trial court found that: (1) the District is a "creature of statute" with no powers other than those granted by statute; (2) R.C. 3709.281 is unambiguous and refers to delegation only of the powers of the legislative authority (the City Council), which are legislative, not executive or administrative, and are not the powers of the municipality (Toledo); (3) R.C. 3709.281 did not authorize the District and Toledo to enter into an agreement to enforce the lead ordinance or perform the other municipal services the lead ordinance contemplates; and (4) as a result, the ordinance and agreement are unconstitutional as violations of Ohio Constitution, Article II, Section 1.

{¶ 29} As noted, the trial court granted a permanent injunction prohibiting the District from enforcing the lead ordinance. "An injunction is an extraordinary remedy in equity where there is no adequate remedy available at law. It is not available as a right but may be granted by a court if it is necessary to prevent a future wrong that the law cannot." *Garono v. State*, 37 Ohio St.3d 171, 173, 524 N.E.2d 496 (1988). "A permanent injunction is not considered an interim remedy. It is issued after a hearing on the merits in which a party has demonstrated a right to relief under the applicable substantive law. A party seeking a permanent injunction must show that the injunction is necessary to prevent irreparable harm and that the party does not have an adequate remedy at law." (Citations omitted.) *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 267-268, 747 N.E.2d 268 (1st Dist.2000). *Accord Island Express Boat Lines, Ltd. v. Put-in-Bay Boat Line Co.*, 6th Dist. Erie No. E-06-002, 2007-Ohio-1041, ¶ 93. The movant's burden of proof is clear and convincing evidence. *Id.*

{¶ 30} Typically, an abuse of discretion standard applies to review of permanent

injunctions. However, where statutory interpretation is involved, de novo review applies. *Mangano v. 1033 Water St., L.L.C.*, 8th Dist. Cuyahoga No. 106861, 2018-Ohio-5349, ¶ 11-12. "In such a review, an appellate court reviews the trial court's decision independently and without deference to the trial court's determination." *Union Stock Yards v. Hillsboro*, 191 Ohio App.3d 564, 2010-Ohio-5975, 947 N.E.2d 183, ¶ 8 (4th Dist.).

{¶ 31} Ohio Constitution, Article II, Section 1 states that "[t]he legislative power of the state shall be vested in a General Assembly consisting of a senate and house of representatives * * *." "Generally, Section 1, Article II of the Ohio Constitution entrusts the police power of the state of Ohio to the General Assembly. However, the Home Rule Amendment contained in Section 3, Article XVIII of the Ohio Constitution directly grants police powers to municipalities." *Dsuban v. Union Twp. Bd. of Zoning Appeals*, 140 Ohio App.3d 602, 608, 748 N.E.2d 597 (12th Dist.2000). Under the Home Rule Amendment, "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Ohio Constitution, Article XVIII, Section 3.

{¶ 32} A three-part test is used to decide if "a municipality has exceeded its powers under the Home Rule Amendment. 'A state statute takes precedence over a local ordinance when (1) the ordinance is in conflict with the statute, (2) the ordinance is an exercise of the police power, rather than of local self-government, and (3) the statute is a general law.' " *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 17, quoting *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 9.

{¶ 33} The only Ohio statutory scheme mentioned by the parties with respect to lead is R.C. Chap. 3742, which relates to lead abatement and testing. Among other things, R.C. 3742.02 prohibits the application of lead-based paint on or inside residential units, child care facilities, or schools, absent a decision by the director of health that no other substitute is available. R.C. 3742.02(A)(2). This statute also restricts employment of persons to perform lead abatement or lead risk assessments on such facilities unless those persons have a valid lead inspector license. R.C. 3742.02(B) and (C).

{¶ 34} When Toledo's lead ordinance was enacted in April 2017, R.C. 3741.01 defined a "residential unit" as "a dwelling or any part of a building being used as an individual's private residence." R.C. 3742.01(DD).[4] At the time, R.C. 3742.41 also provided that:

(A) A property constructed before January 1, 1950 that is used as a residential unit, child care facility, or school shall be legally presumed not to contain a lead hazard and not to be the source of the lead poisoning of an individual who resides in the unit or receives child care or education at the facility or school if the owner or manager of the unit, facility, or school successfully completes both of the following preventive treatments:

(1) Follows the essential maintenance practices specified in section

---

[4] Shortly thereafter, the legislature amended R.C. 3742.01(DD) to include a statement that " 'Residential unit' includes a residential rental unit." In addition, the legislature added new R.C. 3742.01(EE) to define a "Residential rental unit," as "a rental property containing a dwelling or any part of a building being used as an individual's private residence." *See* Am.Sub.H.B. 49, 2017 Ohio Laws 14. The amendments were effective on September 29, 2017.

3742.42 of the Revised Code for the control of lead hazards;

(2) Covers all rough, pitted, or porous horizontal surfaces of the inhabited or occupied areas within the unit, facility, or school with a smooth, cleanable covering or coating, such as metal coil stock, plastic, polyurethane, carpet, or linoleum.

(B) The owner or manager of a residential unit, child care facility, or school has successfully completed the preventive treatments specified in division (A) of this section if the unit, facility, or school passes a clearance examination in accordance with standards for passage established by rules adopted under section 3742.49 of the Revised Code.

(C) The legal presumption established under this section is rebuttable in a court of law only on a showing of clear and convincing evidence to the contrary.[5]

---

[5] R.C. 3742.41 was substantially altered as a result of the September 2017 amendments. R.C. 3742.41(A) was revised to provide that "the director of health shall maintain a lead-safe residential rental unit registry," pursuant to which owners of residential units "may" register if the unit was constructed after January 1, 1978, and has been determined to be lead-free by a licensed lead inspector or lead risk assessor following an inspection. R.C. 3742.41(B) and (C). However, there is no requirement that owners of residential units constructed before January 1, 1978 implement residential unit lead-safe maintenance practices specified in R.C. 3742.42 for controlling lead hazards. The statute says that such owners "may" implement these practices. R.C. 3742.41(B).

The September 2017 amendments also provide for mandatory registration in some instances. A new subsection, R.C. 3742.41(E)(1), states that "[t]he owner of a residential rental unit that is subject to a lead hazard control order under section 3742.37 of the Revised Code shall register the residential rental unit on the lead-safe residential rental unit lead-safe registry after the unit passes a clearance examination, as specified in section 3742.39 of the Revised Code, indicating that the lead hazards identified in the order are controlled." *See* Am.Sub.H.B. 49, 2017 Ohio Laws 14.

R.C. 3742.41(E)(2), also added in 2017, provides an exemption to registration for owners of residential rental units designated as housing for the elderly or as senior housing. *Id.*

{¶ 35} The statutory scheme in R.C. Chap. 3742 also provides for adoption of rules by the director of health regarding administration and enforcement, and investigation of suspected lead poisoning of children. R.C. 3742.03. The director of heath is further allowed to petition and obtain orders to enter residential units, child care facilities, and schools, if permission to access the property has not been given. R.C. 3742.34; R.C. 3742.35. In addition, the director of health may make risk assessments and order lead hazards controlled in such properties. R.C. 3742.35; R.C. 3742.36. Moreover, the director of health is given authority to delegate these duties to a board of health. R.C. 3742.34.[6]

{¶ 36} The parties do not contend that Toledo's lead ordinance conflicts with R.C. Chap. 3742 as it existed when the lawsuit was filed, and the trial court did not base its decision on such a purported conflict.[7] Instead, the court concluded that the District has

---

R.C. 3742.37 (regarding a lead hazard control order) was not amended in 2017. This statute provides that once a risk assessment indicates that lead hazards are contributing to a child's lead poisoning, "the director of health or authorized board of health immediately shall issue an order to have each lead hazard in the property controlled." The order will specify the hazard to be controlled and the date upon which the unit must pass a clearance examination. *Id*.

[6] The statutes discussed in this paragraph of the main text have not changed in any material way since Toledo's lead ordinance was enacted in April 2017. Specifically, R.C. 3742.03 was not amended in 2017, but was amended in 2019. There was no significant change from the statute as it had existed since 2012. *See* Am.Sub.H.B. 166, 2019 Ohio Laws 10. R.C. 3742.34 has not been amended since it was enacted in 2002. R.C. 3742.35 and R.C. 3742.36 were also amended in 2017, but not in any pertinent way. *See* Am.Sub.H.B. 49, 2017 Ohio 14.

[7] In its brief, Legal Aid raised the following points: (1) the trial court's decision abridged Toledo's power of self-government as a home rule city, which allows it to contract with the District; (2) even if the lead ordinance were an exercise of police power, it was lawful and not in conflict with any general laws; (3) focusing strictly on R.C. 3709.281 (and not on the content of R.C. Chap. 3742), R.C. 3709.281 is not a general law; (4) even if R.C. 3709.281 were a general law, it does not conflict with Toledo's lead ordinance; and (5) Toledo's lead ordinance does not conflict with any substantive state-wide lead abatement

only those powers created by statute, and R.C. 3709.281, being unambiguous and limited in scope to a delegation of legislative authority only, does not authorize the City and the District to enter into an agreement to administer and enforce the lead ordinance.

{¶ 37} The Supreme Court of Ohio has said that "a city health district is a state agency rather than a branch of city government."  *Bd. of Health of St. Bernard v. City of St. Bernard*, 19 Ohio St.2d 49, 53, 249 N.E.2d 888 (1969).  "Such health-oriented agencies are administrative arms of the Ohio Department of Health."  *Johnson's Markets, Inc. v. New Carlisle Dept. of Health*, 58 Ohio St.3d 28, 33, 567 N.E.2d 1018 (1991).

{¶ 38} " 'A city board of health is a creature of statute and has such powers only as are expressly conferred on it together with such powers as are necessarily implied in order to effectuate such expressly granted powers.' "  *Wetterer v. Hamilton Cty. Bd. of Health*, 167 Ohio St. 127, 137, 146 N.E.2d 846 (1957), quoting *Brunner v. Rhodes*, 95 Ohio App. 259, 119 N.E.2d 105 (10th Dist.1953).  *See also D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 38-41 (discussing local board's ability to make regulations).  "Implied powers are those that are incidental or ancillary to an expressly granted power; the express grant of power must be

---

measures, and Toledo may supplement state law in unregulated areas.

Although the parties made some limited references to home rule in the trial court, there is no indication that the above issues were specifically raised in the trial court, and the trial court did not consider them.  Furthermore, Appellees did not argue in the trial court that Toledo's lead ordinance conflicts with R.C. Chap. 3742.  On appeal, Appellees have not directly responded to Legal Aid's arguments, nor do they contend that Toledo's lead ordinance conflicts with the statutory scheme in R.C. 3742.  As a result, we express no opinion on these matters.

As noted, R.C. Chap. 3742 was amended in various ways shortly after Toledo's ordinance was enacted.  We also express no opinion on any potential effect of the amendments.

clear, and any doubt as to the extent of the grant must be resolved against it." *In re Guardianship of Spangler*, 126 Ohio St.3d 339, 2010-Ohio-2471, 933 N.E.2d 1067, ¶ 17.

{¶ 39} Under Ohio law, "[a]ny municipal corporation may: (A) Provide for the public health; [and] (B) Secure the inhabitants of the municipal corporation from the evils of contagious, malignant, and infectious diseases; * * *." R.C. 715.37. A municipal corporation may also "(A) Abate any nuisance and prosecute in any court of competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance to exist; [and] * * * (C) Prevent injury and annoyance from any nuisance." R.C. 715.44.

{¶ 40} Similarly, under its municipal code, the City has the power "to define, prohibit, abate or suppress all things detrimental to the health, morals, comfort, safety, convenience, and welfare of the people, and all nuisances and causes thereof." TMC Chap. II, Section 8(I).[8] The City also has the power "[t]o pass such ordinances as are expedient for maintaining and promoting the peace, good government and welfare of the City, and the morals and happiness of its citizens, and for the performance of all municipal

---

[8] There is no dispute here that Toledo is a charter city. " 'By reason of Sections 3 and 7 of Article XVIII of the Ohio Constitution, a charter city has all powers of local self-government *except to the extent that those powers are taken from it or limited by other provisions of the Constitution* or by statutory limitations on the powers of the municipality which the Constitution has authorized the General Assembly to impose.' " (Emphasis sic.) *State ex rel. Commt. for the Charter Amendment, City Trash Collection v. Westlake*, 97 Ohio St.3d 100, 2002-Ohio-5302, 776 N.E.2d 1041, ¶ 31, quoting *Bazell v. Cincinnati*, 13 Ohio St.2d 63, 233 N.E.2d 864 (1968), paragraph one of the syllabus. Furthermore, " '[a]lthough the Constitution gives municipalities the authority to adopt home rule, local self-government, the exercise of those powers by the adoption of a charter should *clearly and expressly* state the areas where the municipality intends to supersede and override general state statutes.' A municipal-charter provision will therefore prevail over a parallel state statute 'only where the conflict appears by the express terms of the charter and not by mere inference.' " (Emphasis sic.) *State ex rel. Harris v. Rubino*, 155 Ohio St.3d 123, 2018-Ohio-3609, 119 N.E.3d 1238, ¶ 17, quoting *State ex rel. Bardo v. Lyndhurst*, 37 Ohio St.3d 106, 109-110, 524 N.E.2d 447 (1988).

functions * * *."   *Id.* at Section 8(m).

{¶ 41} The City's legislative power is vested in an elected council of 12 members. TMC Chap. II, Section 26.   Actions of council are required to be by "ordinance or resolution."   *Id.* at Chap. II, Section 37.   The Mayor may veto resolutions or ordinances, and the veto may be overridden by a three-fourth's vote of all council members.   *Id.* at Chap. II, Section 43A and 43B.

{¶ 42} Under R.C. 731.05:

> The powers of the legislative authority of a city shall be legislative only, it shall perform no administrative duties, and it shall neither appoint nor confirm any officer or employee in the city government except those of its own body, unless otherwise provided in Title VII of the Revised Code. All contracts requiring the authority of the legislative authority for their execution shall be entered into and conducted to performance by the board or officers having charge of the matters to which they relate.   After the authority to make such contracts has been given and the necessary appropriation made, the legislative authority shall take no further action thereon.

{¶ 43} According to Toledo's municipal code, the mayor is the City's chief executive and administrative officer "in whom the executive and administrative powers and duties of the City shall be vested subject to the appropriate delegation of such powers and duties in directors of departments and other administrative officers, boards and commissions as provided for" in Chapter V of the Code.   TMC Chap. V, Section 61.   As relevant here, the Mayor has the duty "to supervise the administration of the affairs of the

City; to see that all ordinances and resolutions of the City are enforced; * * * and to exercise all other executive and administrative powers and perform such duties as are conferred or required by this Charter or by the laws of the State of Ohio upon any mayor or municipal chief executive officer, except as otherwise provided in this Charter." *Id.*

{¶ 44} These duties are consistent with R.C. 733.30, which provides that the mayor "shall perform all the duties prescribed by the bylaws and ordinances of the municipal corporation. He shall see that all ordinances, bylaws, and resolutions of the legislative authority are faithfully obeyed and enforced. He shall sign all commissions, licenses, and permits granted by such legislative authority, or authorized by Title VII of the Revised Code, and such other instruments as by law or ordinances require his certificate."

{¶ 45} Under both the City's charter and the Ohio Revised Code, contracts concerning the City are prepared by the City's law director, who is required to endorse on the contract his or her approval of the form and correctness. TMC Chap. VII, Section 109; R.C. 733.51; R.C. 705.11. TMC Chap. XIII, Section 229 further provides that "[n]o contract shall be executed or purchase made involving an expenditure of Ten Thousand Dollars ($10,000) or more unless the same shall have been first authorized by appropriate legislation. Every such contract shall be in writing and shall be executed in behalf of the City of Toledo by the Mayor."

{¶ 46} As noted, the District is a state agency; it is not a department of the City of Toledo. In the agreement between the City and the District (which was signed by the Mayor), the parties stated that the agreement was being entered into pursuant to R.C. 3709.281. This is the authority, according to Appellants, that allows the District to act. R.C. 3709.281 provides that:

A board of health of a city or general health district may enter into an agreement with the legislative authority of a municipality in which such health district is totally or partially located, and such legislative authority may enter into an agreement with such board of health, whereby such board of health undertakes, and is authorized by such legislative authority to exercise any power, perform any function, or render any service, in behalf of such legislative authority which such legislative authority may exercise, perform, or render.

Upon the execution of such agreement and within the limitations prescribed by it, such board of health may exercise the same powers as such legislative authority possesses with respect to the performance of any function or the rendering of any service, which, by such agreement, it undertakes to perform or render, and all powers necessary or incidental thereto, as amply as such powers are possessed and exercised by such legislative authority directly.  Any agreement authorized by this section does not suspend the possession by such legislative authority of any power or function exercised or performed by such board of health in pursuance of such agreement, and no board of health, by virtue of any agreement entered into under this section, shall acquire any power to levy taxes in behalf of such legislative authority unless approved by a majority of the electors of the municipality.

Every agreement entered into under this section shall provide, either in specific terms or by prescribing a method for determining the amounts,

for any payments which are to be made by the legislative authority in consideration of the performance of the agreement. Such payments shall be made to the health fund of the health district.

{¶ 47} The trial court concluded that this statute was unambiguous and did not allow the City and the District to enter into an agreement for the District to enforce, administer, or implement the lead ordinance.

{¶ 48} "When analyzing a statute, our primary goal is to apply the legislative intent manifested in the words of the statute." *Proctor v. Kardassilaris*, 115 Ohio St.3d 71, 2007-Ohio-4838, 873 N.E.2d 872, ¶ 12. "Statutes that are plain and unambiguous must be applied as written without further interpretation." *Id.* "It is only where the words of a statute are ambiguous, are based upon an uncertain meaning, or there is an apparent conflict of some provisions, that a court has the right to interpret a statute." *Ohio Bus Sales, Inc. v. Toledo Bd. of Edn.*, 82 Ohio App.3d 1, 6, 610 N.E.2d 1164 (6th Dist.1992). Nonetheless, "where a statute is found to be subject to various interpretations, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at legislative intent." *Cline v. Ohio Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 96, 573 N.E.2d 77 (1991).

{¶ 49} There is minimal authority interpreting R.C. 3709.281. The trial court and parties discussed only two Ohio Attorney General Opinions: 1983 Ohio Atty.Gen.Ops. No. 2-274, and 1999 Ohio Atty.Gen.Ops. No. 99-048. The trial court did not consider these opinions in any detail, but simply stated that it did not find these opinions persuasive. July 20, 2018 Opinion and Journal Entry, p. 40.

{¶ 50} In 1983 Ohio Atty.Gen.Ops. No. 2-274, 1983 WL 178742, the attorney

general considered R.C. 3709.08 and R.C. 3709.281 in the context of whether a health board of a general health district could contract with a city or city health district if the city was not located totally or partially within the general health district. *Id.* at *1. The contracts in question included "*public health services*; *e.g., food service inspections, nuisance inspections, and home health care services.*" (Emphasis added.) *Id.* Reviewing R.C. 3709.08 first, the attorney general concluded that it did not empower general health districts to provide services where the city health district was not within the county the general health district served. *Id.* at *2.

{¶ 51} The attorney general also considered the first paragraph of R.C. 3709.281 to see if it empowered the general health district to enter into agreements with municipalities outside the county. *Id.* at 3. The attorney general found the language "imprecisely worded," but interpreted it to mean that R.C. 3709.281, like R.C. 3709.08, did not permit a general health district to enter into agreements with a municipality that was not within the same county. *Id.* In reaching this opinion, the attorney general also contrasted both these statutes with R.C. 3709.282 and R.C. 3709.085, which allowed general health districts to contract regarding the operation of federal programs and air pollution control services. *Id.*

{¶ 52} In 1999 Ohio Atty.Gen.Ops. No. 99-048, 1999 WL 692621, the attorney general did not directly consider R.C. 3709.281. The issue in that case was whether boards of health could impose licensing requirements on plumbers under R.C. 3709.21. The attorney general concluded that the board could require registration of plumbers, along with a registration or license fee as an informational procedure, but imposing other requirements would conflict with R.C. 4740.12, which at that time reserved such

regulation to municipal corporations under R.C. 715.27 or a board of county commissioners under R.C. 3781.102. *Id.* at *2 and fn.1.

{¶ 53} However, in a footnote, the attorney general commented that:

Although the board of health of a general health district does not itself have statutory authority to establish educational requirements for, or otherwise license, plumbing contractors, *the board of health may, by agreement, exercise on behalf of a municipality that municipality's authority to license plumbing contractors who operate within the jurisdiction of the municipal corporation. R.C. 3709.281* (the board of health of a general health district may enter into an agreement with the legislative authority of a municipality under which the board of health is authorized to exercise any power, perform any function, *or render any service that the legislative authority may exercise, perform, or render); see* R.C. 715.27(B). *A board of health may similarly enter into agreements with the board of county commissioners to exercise powers, perform functions, or render services on behalf of the county, see R.C. 307.153,* but no such agreement can grant the board of health authority to license plumbing contractors in the unincorporated areas of the county because the board of county commissioners does not have that authority. *See* R.C. 3781.102(B); 1999 Op. Att'y Gen. No. 99-009, at 2-67. *See generally* R.C. 307.15 (authorizing contracts between a board of county commissioners and a health district) and R.C. 3781.102(B) (county licensing rules may be enforced within a municipality pursuant to a contract under R.C. 307.15).

(Emphasis added.)   1999 Ohio Atty.Gen.Ops. No. 99-048, 1999 WL 692621, at *3, fn. 2. By referencing the authority of a municipality rather than simply its "legislative authority," and by referring to "services," the opinion implies a broader interpretation of R.C. 3708.281 than the trial court's view.

{¶ 54} In addition to the above opinions, there are a few other references in other attorney general opinions.   In 1997 Ohio Atty.Gen.Ops. No. 97-026, 1997 WL 221394, the attorney general addressed whether an individual could simultaneously serve as a member of the board of a general health district and as president of the legislative authority of a non-charter city, if the individual abstained from various votes.   *Id.* at *1. In considering whether a conflict would exist, the attorney general noted that in both positions, an individual may be required to discuss and vote on various matters, including "an agreement between the legislative authority of a city and the board of health, whereby the board of health undertakes, and is authorized by the legislative authority to exercise any power, perform any function, *or render any service*, in behalf of the legislative authority which the legislative authority may exercise, perform, or render, R.C. 3709.281 * * *."   (Emphasis added.)   *Id.* at *2-3.

{¶ 55} The attorney general concluded that even if potential conflicts existed, it was speculative whether any conflicts would occur.   Furthermore, the matters in question did not regularly come before either entity and did not involve their primary functions.   *Id.* at *4.   In particular, the attorney general observed that:

> The circumstances will be infrequent in which the board of health of a general health district will be required to vote on plans pertaining to the construction of a hospital, *contracts or agreements with a city*, rules adopted

by a legislative authority, the location of a solid waste facility, the suitability of the quarters of the board of health, or the destruction of an infected article, building, or structure. Similarly, it is unlikely that the legislative authority of a city will be called upon to vote on the provision of suitable quarters for the general health district, contracts or agreements with a general health district, plumbing and sewage rules that must be approved by the board of health, the empowerment of a board of health to employ scavengers, or the construction of a hospital for dangerous contagious diseases or a quarantine hospital.

(Emphasis added.) *Id.* at *4. Here, the attorney general referred to "contracts or agreements with a city," not contracts or agreements with a legislative authority.

**{¶ 56}** A similar question was considered in 2012 Ohio Atty.Gen.Ops. No. 2012-017, 2012 WL 2094044, regarding whether an individual could serve simultaneously as village mayor and recycling coordinator of the health district. *Id.* at *1. The attorney general commented that:

The first conflict may arise insofar as *the Village and Health District may enter into an agreement with each other. See, e.g., R.C. 3709.281* (board of health of a general health district and legislative authority of a municipality within the health district may enter into an agreement whereby the board of health is authorized to exercise powers, perform functions, or render services on behalf of the legislative authority). As mayor, the person may be required to deliberate, discuss, negotiate, or vote upon the terms of an agreement *between the Village and the Health District.*

Because the mayor also is employed by the Health District, it might be difficult for her to perform her duties and exercise her discretion in an objective and disinterested manner. Similarly, if this person, *as recycling coordinator for the Health District, were required to deliberate, discuss, negotiate, or vote upon an agreement with the Village*, it might be difficult for her to exercise her discretion in an unbiased manner because of her position with the Village.

(Emphasis added.) *Id.* at *3.

{¶ 57} The attorney general noted that "[t]here is an additional conflict of interest that may arise if the Village and the Health District enter into an agreement with each other. The mayor may be required to sign an agreement on behalf of the Village." *Id.* at *4. Ultimately, the attorney general decided that the conflict was speculative and remote, and could be avoided. *Id.* Among other things, the attorney general reasoned that:

As discussed previously, the Village and Health District are not required to enter into agreements with each other, and the signing of such agreements is not a duty that the mayor is regularly required to perform. Thus, the occasions on which the mayor will be required to sign an agreement *between the Village and Health District* should be infrequent. Moreover, prior Attorney General opinions have advised that in executing a village agreement, the mayor does not exercise decision-making authority. Rather, the mayor performs a ministerial duty. *See* 2011 Op. Att'y Gen. No. 2011-023, at 2-191; 2007 Op. Att'y Gen. No. 2007-023, at 2-237.

2012 Ohio Atty.Gen.Ops. No. 2012-017, 2012 WL 2094044, at *4.

{¶ 58} Again, by referencing the agreements of the "village" rather than its "legislative authority," this opinion indicates a broader interpretation of R.C. 3708.281 than the trial court's view.

{¶ 59} The final attorney general opinion does not discuss R.C. 3709.281 but simply includes a list of statutes that provide the board of the health department with various powers. *See* 2011 Ohio Atty.Gen.Ops. No. 2011-032, 2011 WL 3882812 (concluding that "the board of health of a general health district may not enter into a contract with a hospital whereby the services of the health commissioner of the district are leased to the hospital in exchange for a fee" because "the General Assembly did not include any language in the Revised Code" authorizing the board to do so).

{¶ 60} Whether or not one finds these opinions "persuasive," they do indicate that R.C. 3709.281 is ambiguous. "A statute is ambiguous when its language is subject to more than one reasonable interpretation." *Clark v. Scarpelli*, 91 Ohio St.3d 271, 274, 744 N.E.2d 719 (2001). Having reviewed the interpretations of the various attorneys general, we find that they are not unreasonable. We agree that the statute is imprecisely worded; the opinions discussing it have also equated a "legislative authority" with a "municipality" or "village."

{¶ 61} Under established principles of statutory construction, where statutes are ambiguous, courts "may consider several factors, including the object sought to be obtained, circumstances under which the statute was enacted, the legislative history, and the consequences of a particular construction." *Bailey v. Republic Engineered Steels, Inc.*, 91 Ohio St.3d 38, 40, 741 N.E.2d 121 (2001), citing R.C. 1.49. (Other citation

omitted.)

{¶ 62} While health districts are concededly limited to the authority given by the legislature, limiting R.C. 3709.281 as the trial court did is inconsistent with the object to be attained and would result in unintended consequences. As indicated, this statute authorizes health districts and legislative authorities to enter into agreements in which the health district "undertakes, and is authorized * * * to exercise any power, perform any function, or *render any service*, in behalf of such legislative authority * * *." After executing such agreements, health districts may exercise the same powers that the legislative authority has regarding the "performance of any function or the *rendering of any service* * * *."

{¶ 63} For many years, Ohio law has held that a city council cannot delegate the exercise of its legislative functions to another authority or agency. *E.g., City of Cleveland v. Piskura*, 145 Ohio St. 144, 156, 60 N.E.2d 919 (1945).[9] When R.C. 3709.281 was enacted in 1967, the General Assembly would have been aware of this fact, and would not have intended to violate a settled rule. As the City notes, the way in which municipalities operate is that City Council passes ordinances authorizing agreements or contracts, which are then drafted by the city law director and signed by the mayor. *See*

---

[9] This is far from the first decision on the topic of delegation of legislative authority. *See State ex rel. Campbell v. Cincinnati St. Ry. Co.*, 97 Ohio St. 283, 293, 119 N.E. 735 (1918) (noting that while "the rule is well-settled that legislative powers cannot be delegated, it is equally well settled that this principle does not prevent the appointment of administrative agents for the performance of administrative duties in the carrying out of the legislative will"); *City of Akron v. Dobson*, 81 Ohio St. 66, 76, 90 N.E. 123 (1909) ("Prior to the adoption of the Municipal Code of 1902, the city council was an administrative, as well as a legislative body, and one of the reforms contemplated by the adoption of the new Code was to make its powers legislative only.")

City's Amended Brief at pp. 10-11. This is also dictated by law. *See* R.C. 731.05; R.C. 733.30; R.C. 733.51; and R.C. 705.11. These statutes were also in existence when R.C. 3709.281 was enacted in 1967.[10] The General Assembly would have been aware of the existing law and procedures.

{¶ 64} Knowing of such long-standing precedent, the legislature would not have intended that a city council improperly delegate its legislative authority to the health district. Instead, a more reasonable interpretation is that the legislature intended for municipalities, through ordinances passed by city council, to be able to contract with a health district (or any agency) for functions or services that the municipality is otherwise authorized to perform or can appoint an agent to for the carrying out of the legislative will, as noted in *Campbell*, 97 Ohio St. at 293, 119 N.E. 735. There is also a difference between delegating legislative power (making laws) and delegating administrative power (executing laws). *Redman v. Ohio Dept. of Indus. Relations*, 75 Ohio St.3d 399, 404, 662 N.E.2d 352 (1996). As noted by Amicus Curiae Summit, R.C. 3709.281 retains legislative authority for the City Council by stating that:

> Any agreement authorized by this section does not suspend the possession by such legislative authority of any power or function exercised or performed by such board of health in pursuance of such agreement, and no board of health, by virtue of any agreement entered into under this section, shall acquire any power to levy taxes in behalf of such legislative authority unless approved by a majority of the electors of the municipality.

---

[10] All of these statutes were originally part of the General Code, and have been part of the Ohio Revised Code since 1953.

{¶ 65} According to Appellees, the exemption for tax levies in this statute belies the assertion that R.C. 3709.281 does not let a board of health possess legislative power. We disagree. This language is similar to taxation language in R.C. 307.15, which was originally enacted in 1935 as G.C. 2450-2, and has been in essentially the same form since initially enacted. *See* Am.H.B. 112, 116 Ohio Laws 102, Section 2, approved April 15, 1935. Specifically, R.C. 307.15 allows a board of county commissioners to enter into agreements with the legislative authorities of any municipality, as well as other governmental agencies. R.C. 307.15(A)(1). However, as with R.C. 3709.281, the board is not permitted under the agreement to "acquire any power to levy taxes within, and on behalf of, a contracting subdivision unless approved by a majority of the electors of the contracting subdivision." R.C. 307.15(A)(2). There is good reason for such a restriction. "The taxing authority of a municipality may be preempted or otherwise prohibited only by an express act of the General Assembly." *Cincinnati Bell Tel. Co. v. Cincinnati*, 81 Ohio St.3d 599, 693 N.E.2d 212 (1998), syllabus. Despite this prohibition, difficulty can arise when other statutes exist on the same subject.

{¶ 66} An example of this point can be found in *State ex rel. Ranz v. City of Youngstown*, 140 Ohio St. 477, 45 N.E.2d 767 (1942) (*Ranz II*), which involved issues pertaining to taxation by a contracting county. In that case, the city of Youngstown and the Mahoning County Commissioners entered into a written contract pursuant to G.C. 3391-1, agreeing that the commissioners would administer and pay for poor relief within the city's territorial limits and would have authority to levy a special tax for poor relief. *Id.* at 479. Although the county commissioners had paid the cost of the relief (except for funds furnished by the Public Welfare Department), the commissioners had not levied a

tax and had not demanded that the city pay the cost of the relief. *Id.* at 479-489. As a result, a taxpayer filed suit, demanding an accounting of expenditures and a judgment against the city, or alternatively, asking that the commissioners be required to make an annual levy within the city so that the county could be reimbursed. *Id.* at 480.

{¶ 67} At the time, G.C. 3391-1 designated areas *outside* a city's corporate limit to be county relief areas, with the board of county commissioners being appointed as the local relief authority. *Id.* at 487. Each local city was also a relief area, with the local relief authority being the proper city officer or board. *Id.* Under the statute, township trustees could ask the county commissioners to designate the trustees to act as the county's agent for administering poor relief. *Id.* Alternatively, under previously enacted legislation (G.C. 2450-1 to G.C. 2450-6), the "legislative authority" of a city and the board of commissioners of any county in which a city was located could enter into an agreement pursuant to which the commissioners would be authorized to act on the city's behalf. *Id.*

{¶ 68} In that situation, " 'the city shall be a part of the county local relief area, anything to the contrary in section 2450-2 of the General Code notwithstanding; in which event such city shall not, for the duration of such contract, have power to levy taxes for poor relief.' " *Id.* at 487-488, quoting G.C. 3391-1. At the time, G.C. 2450-2 (now R.C. 307.15) provided that if the "commissioners and the city's legislative authority" entered into an agreement for the commissioners "to perform any function or functions or any services or services," the commissioners would exercise the same powers as the contracting subdivision or legislative authority could "exercise, perform, or render." S*tate ex rel. Ranz v. City of Youngstown*, Ohio Com.Pl. No. 110806, 1941 WL 541, *2 (Sept. 18, 1941) (*Ranz I*).

{¶ 69} However, G.C. 2450-2 also provided that "[n]othing in this act nor in any agreement by it authorized shall be construed to suspend the possession by a contracting subdivision of any power or function exercised or performed by the board of county commissioners in pursuance of such agreement.  Nor shall the county commissioners by virtue of any agreement entered into under the authority of this section be deemed to have acquired any power to levy taxes within and in behalf of a contracting subdivision." *Id.*

{¶ 70} G.C. 2450-3 further stated that: "Every agreement entered into under the authority of this act shall provide, either in specific terms or by prescribing a method for determining the amounts, for any payments to be made by the contracting subdivision into the county treasury, in consideration of the performance of the agreement. * * * " *Ranz I* at *2.    The common pleas court held in *Ranz* that the phrase in G.C. 2450-3 "for any payments" was not a mandatory requirement that the agreement had to provide covenants to pay some amount of money.  *Id.* at *3.  The common pleas court thus found no claim for relief and dismissed the action.  *Id.* at *4.

{¶ 71} After the court of appeals reversed the trial court, further appeal was taken to the Supreme Court of Ohio, which reversed the appellate court and affirmed the trial court's decision.  *Ranz II*, 140 Ohio St. at 480, 45 N.E.2d 767.  According to the Supreme Court of Ohio, "poor relief is a state function."  *Id.* at 482.  Furthermore, counties are created by the State's sovereign power, and their actions reflect state policy; in contrast, municipal corporations are created for the convenience and interest of local people.  *Id.* at 483.[11]    As a result, there was "no inherent reason why the county, which

---

[11] The court noted that because the county involved in the case "has not adopted a

embraces all municipalities and townships within its limits, may not be made the unit for poor relief at the sole expense of the county and either with or without state aid." *Id.* at 484.

**{¶ 72}** The court noted that before the enactment of G.C. 2394-6 in 1935 and G.C. 3391 et. seq. in 1939, poor relief was covered by G.C. 3476, which had been in effect for many years.[12] Under G.C. 3476, counties were only charged with providing relief to persons who fit within a small class like paupers, persons without residency requirements, and so forth. Townships and cities were charged with providing temporary or partial relief to residents of the city, township, county, or states. *Ranz II* at 485. However, in July 1935, G.C. 2394-6 was enacted, allowing the board of commissioners of any county to provide for persons requiring non-institutional support and to establish an agency for administration. *Id.*

**{¶ 73}** According to the Supreme Court of Ohio, G.C. 3391 et. seq. and G.C. 2394-6, modified G.C. 3476 to "make sure that the county would not be relieved of permanent relief cases." *Id.* at 486. Under G.C. 3391-1, county commissioners were the local county relief authority for territory outside corporate limits, and each city was its own local relief authority. *Id.* at 486-487. However, as noted, a city's "legislative authority" could contract with the county commissioners under G.C. 2450-1 to G.C. 2450-6 "whereby such board of county commissioners *is* authorized *to act as the local relief authority for and in behalf of the city*." (Emphasis added.) *Ranz II*, 140 Ohio St. at 487, 45 N.E.2d 767.

---

charter or alternative form of government, it still remains a mere agency of the state." *Ranz II*, 140 Ohio St. at 482, 45 N.E.2d 767.

[12] These new statutes were enacted during the period of the Great Depression.

Where such an agreement existed, the city would be part of the county local relief area, notwithstanding anything in G.C. 2450-2. *Id.*

{¶ 74} In explaining the meaning of G.C. 2450-2, the Supreme Court of Ohio commented that:

Section 2450-2, General Code, authorizes agreements between the county commissioners and other legislative authorities, but provides that the county commissioners should not *by virtue of that act* (116 Ohio Laws, p. 102) be deemed to have acquired any power to levy taxes within and in behalf of a contracting party. This feature of Section 2450-2, *forbidding* the levying of taxes *under the contract*, was specifically amended in Section 3391-1, supra.

Section 2450-3, General Code, requires that agreements *made pursuant to Section 2450-2* shall provide either in specific terms or prescribe a method for determining amounts for money payments to be made by the contracting subdivision into the county treasury in consideration of the performance of the agreement. However, there is no provision even here for *requiring any payment* to be made.

(Emphasis sic.) *Ranz II*, 140 Ohio St. at 488-489, 45 N.E.2d 767.

{¶ 75} Accordingly, county commissioners, under the provisions of R.C. 3391-1, could become the taxing authority but did not have to collect money from the municipality for any part of the cost to administer poor relief because R.C. 3391-1 had eliminated any requirement that cities must provide poor relief (due to their ability to contract it away), nor were the commissioners precluded from having the ability to tax where they assumed

a city's responsibilities, because G.C. 3391-1 explicitly permitted them to do so. *Id.* at 489.

{¶ 76} The tax provision in R.C. 307.15 (formerly G.C. 2450-2) was intended to ensure that even if a municipality contractually delegates some of its duties to another party, the fact that a contract exists does not, therefore, allow the other party to usurp the municipality's taxing authority. The indication from *Ranz II* is that in certain situations, the legislature may allow taxation to be delegated as well. Again, this is consistent with the fact that "[t]he taxing authority of a municipality may be preempted or otherwise prohibited only by an express act of the General Assembly." *Cincinnati Bell Tel. Co.*, 81 Ohio St.3d at 599, 693 N.E.2d 212. The fact that taxation is specifically mentioned in R.C. 307.15 as well as in R.C. 3709.281 serves the purpose of reserving an important power (the power to tax).

{¶ 77} As noted, G.C. 3391-1 was enacted during the Great Depression and involved a situation – poor relief – which was undoubtedly critical at the time. Thus, counties (which had previously been able to evade responsibility), were given responsibility for poor relief outside corporate limits, and were also allowed to levy taxes where they assumed responsibility within a city. In view of these considerations, the fact that taxation was included in R.C. 3709.281 does not contradict the City's arguments; instead, it reflects the fact that restrictions on municipal taxation must be specifically authorized by statute (which was done in *Ranz II*), and should not arise simply because a contract has been made between a city and another agency. Conflicts, as arose in, can then be avoided.

{¶ 78} Returning to the question of statutory interpretation, R.C. 1.49(D) looks at

"[t]he common law or former statutory provisions, including laws upon the same or similar subjects." We have already discussed former statutes to some extent. Regarding similar statutes. R.C. 307.153 uses the same wording as R.C. 3709.281, but focuses on agreements for services between the board of county commissioners and the board of health. Again, there is almost no authority interpreting this statute. There are three attorney general opinions, but only one has any particular bearing. As previously noted, in 1999 Ohio Atty.Gen.Ops. No. 99-048, 1999 WL 692621, the attorney general mentioned both R.C. 3709.281 and R.C. 307.153 in a footnote, when discussing whether the board of health had statutory authority to license plumbers. The attorney general noted that under R.C. 307.153, "[a] board of health may similarly enter into agreements with the board of county commissioners to exercise powers, perform functions, or render services *on behalf of the county*." (Emphasis added.) *Id*. at *3, fn.2. Again, the attorney general did not distinguish between a county's legislative authority and the county itself.

{¶ 79} Like health districts, boards of county commissioners are restricted to only the powers that are expressly conferred by statute, unless they acquire some home rule powers through constitutional procedures. *State ex rel. Shriver v. Bd. of Commrs. of Belmont Cty.*, 148 Ohio St. 277, 280, 74 N.E.2d 248 (1947); *Geauga Cty. Bd. of Commrs. v. Munn Rd. Sand & Gravel*, 67 Ohio St.3d 579, 583, 621 N.E.2d 696 (1993), fn. 2.

{¶ 80} In its brief, the District also raised the similarity of R.C. 307.15, but Appellees have not responded to this point. As we mentioned, R.C. 307.15 allows boards of county commissioners to enter into agreements with various legislative authorities. This statute provides that:

Subject to division (C) of this section [pertaining to investment services], the board of county commissioners may enter into an agreement with the legislative authority of any municipal corporation, township, port authority, water or sewer district, school district, library district, health district, park district, soil and water conservation district, water conservancy district, or other taxing district, or with the board of any other county, and such legislative authorities may enter into agreements with the board of county commissioners, whereby the board undertakes, and is authorized by the contracting subdivision, to exercise any power, perform any function, or render any service, on behalf of the contracting subdivision or its legislative authority, that such subdivision or legislative authority may exercise, perform, or render; or whereby the legislative authority of any municipal corporation undertakes, and is authorized by the board of county commissioners, to exercise any power, perform any function, or render any service, on behalf of the county or the board, that the county or the board may exercise, perform, or render.

R.C. 307.15(A)(1). This statute also gives "legislative authorities" a reciprocal ability to agree to perform the same functions and services on behalf of a board of commissioners. *Id.*

{¶ 81} As we also mentioned, R.C. 307.15 has been effect in essentially the same form since it was initially enacted as G.C. 2450-2 in 1935. *See* Am.H.B. 112, 116 Ohio Laws 102, Section 2, approved April 15, 1935. Both R.C. 307.15 and its predecessor have been interpreted as "broad" and encompassing "any power, function, or service

which the contracting subdivision or its legislative authority may exercise, perform, or render." 1985 Ohio Atty.Gen.Ops. No. 85-086, 1985 WL 204539, *2, discussing G.C. 2450-2 and 1952 Op. Atty. Gen. No. 1330.

{¶ 82} In its decision, the trial court distinguished R.C. 315.07 because it includes the terms the "*contracting subdivision or its legislative authority.*" (Emphasis sic.) Trial Court Opinion and Journal Entry at pp. 35-36 and fn. 7. The court did not discuss its reasoning in detail, but commented that the City's remedy would be to have the General Assembly amend R.C. 3709.281 "to expressly authorize the District to perform municipal services." *Id.* at p. 35.

{¶ 83} Again, we disagree that these statutes should be read so narrowly. We note that R.C. 307.14(A) and (B) do define both "legislative authority" and "contracting subdivision." However, "contracting subdivision" is defined as "any governmental subdivision or taxing district of the state *which*, *by its legislative authority, enters into an agreement* with a board of county commissioners under the authority of" R.C. 307.14 to R.C. 307.19." (Emphasis added.) R.C. 307.14(B). This definition has remained the same since G.C. 2450-1 (the predecessor of R.C. 307.14) was enacted in 1935. *See* 116 Ohio Laws 102 at Section 1. In *Ranz II*, when discussing the predecessor of R.C. 307.15, the Supreme Court of Ohio did not distinguish between "legislative authority" and city council or commissioners, and municipality or county; instead, the court mixed these terms. *See Ranz II*, 140 Ohio St. at 488-492, 45 N.E.2d 767.

{¶ 84} As noted, the way in which a charter city contracts is through its legislative authority, pursuant to ordinances signed by the mayor. Without delving too deeply into county government, a board of commissioners is likewise the legislative authority for a

county. *Blacker v. Wiethe*, 16 Ohio St.2d 65, 68, 242 N.E.2d 655 (1968) ("Section 1 of Article X [of the Ohio Constitution] authorizes the General Assembly by general law to delegate to the board of county commissioners limited legislative power relative to the government of a county * * * "); R.C. 302.13(m); R.C. 302.12.[13]   The county executive, like a mayor, is the administrative head of the county and may veto or approve ordinances.   R.C. 302.18(A) and (D).

{¶ 85} As a further matter, R.C. 307.14 states that its definitions apply to R.C. 307.14 through R.C. 307.19, which would include R.C. 307.153.   This did not prevent the attorney general from concluding that under R.C. 307.153, "[a] board of health may similarly enter into agreements with the board of county commissioners to exercise powers, perform functions, or render services on behalf of the county."   1999 Ohio Atty.Gen.Ops. No. 99-048, 1999 WL 692621 at *3, fn.2.

{¶ 86} Again, we believe the trial court employed too restrictive a view of a statute that, frankly, is not a model of clarity.   Principles of construction also stress that in enacting statutes, "[a] just and reasonable result is intended," and "[a] result feasible of execution is intended."   R.C. 1.47(C) and (D).   As we read all these statutes, the intent is to ease the ability of various governmental entities to contract with each other to perform functions that one of the parties is unable or unwilling to do.   The trial court's view adds

---

[13] The statement about legislative power being limited refers to the fact that the legislative power that can be granted is only such as relates to government of the county; and, as indicated by the third sentence of that section, such county legislative power may not conflict with any legislative power of a municipality or township not transferred by such municipality or township to the county.   In addition, unless a county has "adopted a charter or alternative form of government, it still remains a mere agency of the state." *Ranz II*, 140 Ohio St. at 482, 45 N.E.2d 767.   R.C. 302.01-302.07 provide for adoption of an alternate form.

complexity to legislation that has functioned for many years. Furthermore, we agree with the District that including the words "render any service" in R.C. 3709.281 supports our interpretation. Legislative authorities like a city council or a board of county commissioners do not perform services, but municipalities and counties do.

{¶ 87} As a final matter, we note that Appellants have argued both here and in the trial court that the section heading of R.C. 3709.281 ("Agreement by a board of health to perform municipal services") also supports their interpretation of the statute. [14] Specifically, this heading contemplates *services* of a municipality, not legislative powers. *See* District's Reply Brief, p. 3.

{¶ 88} The trial court rejected any consideration of this point, based on R.C. 1.01, which states that "section headings * * * do not constitute any part of the law as contained in the 'Revised Code.' " July 20, 2018 Opinion and Journal Entry at p. 34. Citing R.C. 1.01, the Supreme Court of Ohio remarked that "[t]he General Assembly has * * * quite explicitly stated that the substance of a statute is not to be gleaned from its appellation." *Viers v. Dunlap*, 1 Ohio St.3d 173, 175, 438 N.E.2d 881 (1982), *overruled on other grounds, Wilfong v. Batdorf*, 6 Ohio St.3d 100, 103, 451 N.E.2d 1185 (1983).

{¶ 89} R.C. 1.01 has been in its current form, with only a non-pertinent amendment, since 1953. *See* Am.H.B. 9, 2011 Ohio Laws 9. Both before and after the enactment of R.C. 1.01, the Supreme Court of Ohio has given some consideration to section headings when construing statutes, but has rejected an attempt to alter unambiguous statutory language. *See State ex rel. Murphy v. Athens Cty. Bd. of*

---

[14] This is the title of the statute as enacted. *See* Am.H.B. 228, 132 Ohio Laws, Part I, p. 1221. The title as reflected in Westlaw is slightly different, and is incorrect.

*Elections*, 138 Ohio St. 432, 435, 35 N.E.2d 574 (1941), and *State v. Kiser*, 13 Ohio St.2d 126, 128, 235 N.E.2d 126 (1968) (noting that, "while not totally persuasive," a section title added credence to the court's construction of a statute). *Accord State v. Hancovsky*, 2015-Ohio-2602, 38 N.E.3d 471, ¶ 85 (11th Dist.); *Dade v. Bay Village Bd. of Zoning Appeals*, 8th Dist. Cuyahoga No. 87728, 2006-Ohio-6416, ¶ 28.

{¶ 90} We agree that titles or section headings are not part of the law. However, we also agree that they may aid in construction where a statute is ambiguous. As noted, R.C. 3709.281 is ambiguous, and the section heading, by referring to the rendering of "municipal services," supports Appellants' view. We have not given this factor significant weight, but it does have some bearing on the matter.

{¶ 91} Based on the preceding discussion, the trial court erred in finding that R.C. 3709.281 does not allow the City and the District to enter into an agreement for the District to enforce the lead ordinance, and that the agreement violated Article II, Section 1 of the Ohio Constitution. Accordingly, this part of the assignment of error is sustained.

## B. Equal Protection

{¶ 92} Appellants' second issue involves the protection granted by the Equal Protection Clauses of the Ohio Constitution, Article 1, Section 2, and the Fourteenth Amendment, Section 1, to the U.S. Constitution. According to Appellants, the trial court erred in holding Toledo's lead ordinance unconstitutional as a violation of equal protection.

{¶ 93} In its decision, the trial court held that applying the ordinance to rental properties involving either single family homes or rental properties with four or less units

lacks a rational basis. The court also held that the current definition of "Owner" is unworkable and renders the ordinance's classifications irrational. We will address these points separately.

### 1. Classification of Rental Units

{¶ 94} TMC 1760.05(a) presumes that paint on the interior and exterior of residential rental units constructed before 1978 is lead-based. The Code also requires that owners of rental properties consisting of four or less units identify and address "the presence of deteriorated paint, bare soil and lead dust on the interior and exterior of pre-1978 residential structures * * *." TMC 1760.01. The presumption can only be rebutted by obtaining a lead-safe certification, and the City set deadlines for dwelling units in specific census tracts to comply with the lead safe certification requirement by one of three dates: June 30, 2018; June 30, 2019, or June 30, 2020. Failure to comply would result in fines. TMC 1760.05 and 1760.15. As we further noted, the ordinance's purpose is to "to help prevent the poisoning of" Toledo's residents. *Id.*

{¶ 95} The trial court's decision was based on the fact that, despite the presumption of the presence of lead, the ordinance burdens only some owners and gives other owners (of pre-1978 large rental units) a competitive advantage that lacks a fair and substantial relation to the ordinance's object. July 20, 2018 Opinion and Journal Entry at pp. 45-47.

{¶ 96} "An equal-protection analysis of any law centers upon the law's classification of persons and whether the classification relates to a legitimate government interest." *State v. Mole,* 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 24.

The trial court applied a rational basis test, and the parties do not dispute the application of this test. The analysis under both the Ohio and federal systems is similar, although the Supreme Court of Ohio has recently held that equal protection under Ohio's constitution is "co-extensive with or stronger than, that of the federal constitution." *State v. Noling*, 149 Ohio St.3d 327, 2016-Ohio-8252, ¶ 11, citing *Mole* at ¶ 14-23.[15]

{¶ 97} "A party who challenges a statute on equal-protection grounds must demonstrate 'either that there was no rational basis for the creation of the class itself or that those within the class are not being treated equally in the furtherance of a legitimate governmental interest.' " *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, ¶ 48, quoting *Morris v. Savoy*, 61 Ohio St.3d 684, 691, 576 N.E.2d 765 (1991). "We will set aside legislative classifications only if they are 'based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them.' " *Id.*, quoting *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982).

{¶ 98} In deciding that the classifications bore no rational relation to the ordinance's goals, the trial court focused on Toledo's findings in connection with a prior ordinance, which noted that lead poisoning poses a substantial risk to adults and especially children in Toledo, and that no amount of lead is safe, meaning that

---

[15] The Supreme Court of Ohio has not yet settled the issue of whether the federal and Ohio equal protection clauses are "functionally equivalent" or whether, as suggested in later cases, Ohio's guarantee is independent and stronger than federal protection. *State v. Moore*, 154 Ohio St.3d 94, 2018-Ohio-3237, 111 N.E.3d 1146, ¶ 40-41 (Fisher, J., concurring in judgment only). For purposes of this case, this is not an issue, as no party contends that Ohio extends greater protection. *See Simpkins v. Grace Brethren Church of Delaware, Ohio*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, ¶ 46 (noting the same point).

"[e]liminating all lead exposure in our environment is our best course of action." Opinion and Journal Entry at p. 46.[16] The trial court then commented that "[t]he Lead Ordinance does not contain any finding that rental properties owned by the unregulated owners pose no risk. On the contrary, eliminating all lead exposure in its environment is Toledo's best course of action." *Id.* at p. 47.

{¶ 99} According to Appellants, the trial court ignored the finding in the ordinance that " 'the majority of lead poisoning of children occurs in rental properties that are either single family homes or four (4) units or less.' " District's Brief at p. 20, quoting TMC 1760.01. *See also* City's Amended Brief, pp. 4-5, 6, and 8. Appellants contend that statutes do not lack a rational basis simply because they address issues on an incremental basis. They also note that the Supreme Court of Ohio has upheld classifications between rental properties that contain different numbers of units. *Id.* at p. 8.

{¶ 100} In *Ohio Apt. Assn. v. Levin*, 127 Ohio St.3d 76, 2010-Ohio-4414, 936 N.E.2d 919, the Supreme Court of Ohio considered whether administrative rules adopted under R.C. 319.302 violated equal protection because they "resulted in disparate treatment of similarly situated property owners based solely on the number of units contained on the property." *Id.* at ¶ 3. In the case before us, the trial court rejected *Ohio*

---

[16] The trial court was referring to the "summary and background" of the initial Toledo lead ordinance, Ord. 226-16, which is not in the record. That ordinance was passed in August 2016. *See* January 26, 2018 City of Toledo's Combined Response to Plaintiff's Motion for Summary Judgment and Reply to Motion for Summary Judgment, Ex. A, p. 1. The lead ordinance in question in this case is Toledo Ord. 167-17, which was passed on April 18, 2017. For purposes of discussion, we will accept the trial court's statements about the content of the ordinance. We note that the parties stipulated that the trial court could take judicial notice of all Toledo ordinances and Toledo's charter. Joint Stipulations, No. 8. Unfortunately, we were unable to locate the former ordinance online.

*Apt.* and another similar case because they concerned "taxation of rental properties and cannot reasonably be deemed relevant to the purpose of the Lead Ordinance, which is protecting Toledo's renters from exposure to lead hazards." July 20, 2018 Opinion and Journal Entry at p. 47. Again, we disagree.

{¶ 101} While the underlying factual background in *Ohio Apt.* involved taxation, the court's decision was based on an application of general constitutional principles pertaining to equal protection. In *Ohio Apt.*, properties improved with four of more dwellings received a 10% rollback in property taxes, while those improved with more than four units were not so entitled. *Ohio Apt.* at ¶ 36. The court rejected the appellants' equal protection claim on various grounds, one of which was that appellants had unduly focused on the "differing treatment of property," when the "Equal Protection Clause protects people, not property." *Id.* at ¶ 39. The court commented that "[b]ecause the Equal Protection Clause protects people, the proper analysis focuses on the classification of property owners." *Id.*

{¶ 102} The court then said that "[t]o the extent that appellants' claim relates to classification of property owners, we rejected a virtually identical argument in *Roosevelt Properties Co. v. Kinney* (1984), 12 Ohio St.3d 7, 12 OBR 6, 465 N.E.2d 421." *Id.* at ¶ 40.[17] After considering the appellants' proof, the court concluded that they failed to show that they were similarly situated to owners of "single-family homes, duplexes, and triplexes * * *." *Id.* at ¶ 40. Subsequently, the court considered appellants' argument that the rules violated the Equal Protection Clause because the "distinction by number of

_____

[17] *Roosevelt Properties* is the other case the trial court rejected. July 20, 2018 Opinion and Journal Entry at p. 47.

units is illusory, and there is no evidence of any other reasonable basis for distinguishing between rental properties."   *Id.* at ¶ 48.

{¶ 103} Again citing *Roosevelt Properties*, the court noted that it had previously rejected this argument.   *Id.* at ¶ 49.   The court stressed that "when it comes to drawing legal classifications under the rational-basis standard, the line drawn need not be perfect for constitutional purposes."   *Id.*, referencing *Hegenes v. State,* 328 N.W.2d 719 (Minn.1983) (which was cited in *Roosevelt Properties*).   The Supreme Court of Ohio then stated that:

> *Hegenes* observed that genuine distinctions exist between small rental properties and large multiunit apartment complexes.   Moreover, the *Hegenes* court rejected the contention – the same contention raised by appellants here – that the classification became arbitrary and unreasonable for equal protection purposes solely because the differences between small and larger rental properties diminish when comparing triplexes to four-unit properties.   * * *

> In *Roosevelt Properties*, we agreed with the line of reasoning in *Hegenes*: the fact that these differences diminish when comparing four-unit properties to five-unit properties becomes a question of legislative line drawing.   We held that "since the Equal Protection Clause does not impose an 'iron rule of equality,' " the line drawn between four- and five-unit properties was reasonable.   *Roosevelt Properties*, 12 Ohio St.3d at 15, 12 OBR 6, 465 N.E.2d 421, quoting *Allied Stores of Ohio, Inc. v. Bowers* (1959), 358 U.S. 522, 526, 79 S.Ct. 437, 3 L.Ed.2d 480. These same

principles are directly applicable to this case.

*Ohio Apt.*, 127 Ohio St.3d 76, 2010-Ohio-4414, 936 N.E.2d 919, at ¶ 50-51.

**{¶ 104}** The "line" in *Ohio Apt.* involved the fact that properties with three or fewer units "were more characteristic of residential properties" than properties with four or more units, which were more like commercial properties. *Id.* at ¶ 52. In addition, the properties with less units appreciated similarly in value, while appreciation rates for larger properties were substantially less. *Id.* The court, therefore, found a rational basis for the legislature's decision. *Id.* at ¶ 55.

**{¶ 105}** Here, the justification for the line the City drew is that the majority of lead problems exist in rental properties with four units or less. TMC 1760.02(a). We cannot say that this distinction is irrational or unrelated to a legitimate state purpose.[18]

---

[18] According to documents attached to the brief of Amicus Curiae, Legal Aid, a coalition of advocates, including Advocates of Basic Legal Equality and Toledoans United for Social Action, had proposed a lead ordinance applying to "any unit built before 1978 and constructed as a single family home or duplex." Appendix B, City of Toledo Analysis of Impediments to Fair Housing Choice 2015, p. 184. Although this document was apparently not before the trial court, it is available online at https://www.toledofhc.org/wp-content/uploads/2018/03/FH-Analysis-of-Impediments-Plan-part-2.pdf (accessed December 3, 2019).

Judicial notice has been taken of various matters found on websites. *E.g.*, *Disciplinary Counsel v. Weithman*, 143 Ohio St.3d 84, 2015-Ohio-482, 34 N.E.3d 865, ¶ 22, fn. 4 (noting that the board of professional conduct had taken judicial notice of the Mayo Clinic website); *State v. Menchu*, 2d Dist. Montgomery No. 27339, 2017-Ohio-8252, ¶ 17, fn.1 (commenting that the court could take judicial notice of sunrise/sunset chart on the website of the United States Naval Observatory, Astronomical Applications Department, pursuant to Evid.R. 201, but did not need to do so for its decision); *Malone v. Berry*, 174 Ohio App.3d 122, 2007-Ohio-6501, 881 N.E.2d 283, ¶ 13 (10th Dist.) (taking judicial notice of factual information on website); *State v. Elliott*, 4th Dist. Ross No. 06CA2924, 2007-Ohio-2178, ¶ 14 (taking judicial notice of geographical facts on Mapquest website).

The submitted information indicates that the proposed ordinance the coalition of advocates recommended before their 2015 report (and before Toledo's ordinance was adopted) was more restrictive in that it only applied to single family and duplex units. While not critical to our analysis, this does speak to the rationality of the ordinance that

Furthermore, as the City argues, "when a legislative body chooses to act to correct a given evil it need not correct all the evil at once, but it may proceed step-by-step." *State v. Buckley*, 16 Ohio St.2d 128, 134, 243 N.E.2d 66 (1968), citing *Yee Bow v. City of Cleveland*, 99 Ohio St. 269, 124 N.E. 132 (1919), *Porter v. City of Oberlin*, 1 Ohio St.2d 143, 205 N.E.2d 363 (1965), and *City of Xenia v. Schmidt*, 101 Ohio St. 437, 130 N.E. 24 (1920).

{¶ 106} "Under the rational-basis standard, a state has no obligation to produce evidence to sustain the rationality of a statutory classification." *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 91. In addition, a party attacking legislation "bears the burden to negate every conceivable basis that might support the legislation." *Id. See also Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 58, 717 N.E.2d 286 (1999).

{¶ 107} In view of the preceding discussion, Appellees failed to meet their burden in the trial court of establishing that the classifications in the ordinance lacked a rational basis and were unrelated to the ordinance's purpose, which was to "help prevent the poisoning of" Toledo's residents. TMC 1760.01. The classifications, therefore, did not violate equal protection, and the trial court erred in so holding. Accordingly, this part of the trial court's decision will be reversed.

2. Definition of Owner

{¶ 108} Appellants also challenge the trial court's conclusion that the ordinance's definition of "Owner" renders the classifications "so narrow in scope that they are

---

was adopted.

irrational" and violate equal protection.   July 20, 2018 Opinion and Journal Entry at p. 48. According to the City, even if the definition is flawed, that is not a constitutional basis for rejection, and if we can find a rational basis for the current definition, no violation has occurred.   The City does not suggest, however, what the rational basis here would be.

{¶ 109} As noted, the lead ordinance imposes various duties on owners of residential rental property.   "Owner" is defined very broadly, and includes, among other things, any person or agent or employee of such, "who has care, custody, control or charge of a premises or part thereof, has legal title to the premises, or has done any act to maintain or operate the premises."   TMC 1760.04(20); TMC 1726.01(b)(1).   It also includes any operator of a premises.   TMC 1726.01(b)(2).   Maintaining the premises includes, among other things, "entering into a public utility contract."   TMC 1726.01(b)(1)(A).

{¶ 110} The trial court concluded that the definition is irrational because every tenant is an owner, as is everyone who has a gas or electric bill placed in his or her name. Journal and Entry at p. 49.   In addition, residential rental property under the ordinance does not include any "dwelling unit" occupied by the owner or members of the owner's immediate family.   According to the court, it therefore is arguable whether the ordinance would ever be triggered.   Id.

{¶ 111} We agree with the trial court's reservations, but have additional concerns. As noted, under the definition of an owner, any renter who has contracted with a public utility will be responsible for the duties imposed by the ordinance.   This is irrational, as no one would expect tenants to be responsible for obtaining inspections and obtaining lead certification for properties they do not own.   In addition, the definition of owner

includes any person or entity or an agent of such who has "done *any act* to maintain or operate the premises." (Emphasis added.) TMC 1726.01(b)(1). This could include someone who comes to a property to repair a door or an air-conditioner. While "maintaining or operating" is defined to include obtaining building permits and other permits or licenses, it also states that this definition "shall include [these items] *without limitation*" – meaning that "maintaining" could involve minor repairs. (Emphasis added.) TMC 1726.01(b)(1)(A). Again, this definition broadens the ordinance in such a way that it is irrational.

{¶ 112} Furthermore, an "operator" includes any lessee who sublets the premises to another, and such a lessee is deemed a co-owner with joint responsibility over the premises that are sublet. TMC 1726.01(c)(3). Again, this encompasses individuals who are not normally responsible for maintaining property or engaging in something like lead abatement.

{¶ 113} In light of the above discussion of law we cannot find any justification on which to sustain the definition of "Owner" in the ordinance. *See Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 48. Accordingly, the trial court's decision will be affirmed only insofar as the court found that this definition violates equal protection by rendering the ordinance's classifications irrational.

{¶ 114} We note that in a trial court memorandum, the City included proposed legislation changing the definition of "Owner." *See* June 13, 2018 City of Toledo Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, Ex. A, p. 1 (Proposed Ord. 232-18, Version 1). Under the proposed legislation, the definition of "Owner" in TMC 1760.04(a)(20) would be changed to mean "any legal entity or person

who has title to the Residential Rental Property." Ex. A at p. 1. This has no effect here, since we are only considering the ordinance as it existed when Appellees filed the complaint. There is also no indication that the ordinance was ever amended, as the proposed definition does not appear in the current municipal code.

## C. Award of Attorney Fees

{¶ 115} The City has raised an additional argument, even though it has not been included as a separate assignment of error. This final argument is that the trial court erred in awarding attorney fees under R.C. 733.61. The District has not asserted this error, as the fee award only involves the City.

{¶ 116} In an order filed in January 2019, the trial court concluded that Appellee, Mack, had good cause to believe her allegations were well-founded, and awarded her $35,000 in costs, including reasonable attorney fees, pursuant to R.C. 733.61. The trial court also stayed payment of the fee award pending appeal.

{¶ 117} In its brief, the City contends that the fee award was unwarranted for two reasons: first, Mack failed to wait for Toledo's law director to respond to her request before filing suit; and second, Mack's taxpayer action did not benefit the public because her purpose in filing suit was her own economic self-interest rather than the public interest. The City also maintains that the suit damaged public health by continuing to expose Toledo's children to lead hazards in residential rental properties.

{¶ 118} R.C. 733.56 requires a city law director to "apply, in the name of the municipal corporation, to a court of competent jurisdiction for an order of injunction to restrain the misapplication of funds of the municipal corporation, the abuse of its corporate

powers, or the execution or performance of any contract made in behalf of the municipal corporation in contravention of the laws or ordinance governing it, or which was procured by fraud or corruption." If the law director fails, after written request, to file suit, a taxpayer "may institute suit in his own name, on behalf of the municipal corporation." R.C. 733.59.

{¶ 119} R.C. 733.61 further provides that:

If the court hearing a case under section 733.59 of the Revised Code is satisfied that the taxpayer had good cause to believe that his allegations were well founded, or if they are sufficient in law, it shall make such order as the equity of the case demands. In such case the taxpayer shall be allowed his costs, and, if judgment is finally ordered in his favor, he may be allowed, as part of the costs, a reasonable compensation for his attorney.

{¶ 120} "Where the statutory requirements necessary to maintain a taxpayer's action, pursuant to R.C. s 733.59, are met or waived, and the action has been brought on behalf of the public and resulted in a public benefit, the equity of the case demands that the trial court exercise its discretion in considering the allowance of attorney fees to the successful taxpayers." *State ex rel. White v. City of Cleveland*, 34 Ohio St.2d 37, 295 N.E.2d 665 (1973), paragraph three of the syllabus. *See also Hess v. Toledo*, 133 Ohio App.3d 729, 734, 729 N.E.2d 823 (6th Dist.1999), citing *State ex rel. Commt. for Charter Amendment Petition v. Avon*, 81 Ohio St.3d 590, 595, 693 N.E.2d 205 (1998).

{¶ 121} Because the trial court is exercising discretion, we would, therefore, review the decision for abuse of discretion. " ' " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. * * * It is to be expected that

most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." ' " *State v. Flores*, 6th Dist. Wood No. WD-18-016, 2018-Ohio-3980, ¶ 7, quoting *State v. Stone,* 2d Dist. Clark No. 2011 CA 96, 2012-Ohio-4755, ¶ 22, which in turn, quotes *AAAA Ents., Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). " ' "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." ' " *Id.* *See also Baker v. R/A Cab Co.*, 6th Dist. Lucas No. L-19-1031, 2019-Ohio-4375, ¶ 14; *Wenzke v. Baird*, 6th Dist. Lucas No. L-13-1244, 2014-Ohio-3069, ¶ 10.

{¶ 122} "Although a prerequisite to the allowance of attorney fees in a taxpayer's action is the bestowal of a benefit upon the public through the efforts of the taxpayer, the benefit need not be monetary and a fund need not be created or preserved. The benefit obtained by the public through the action of the taxpayer may be of an intangible character, such as the prevention of illegal government activity." *Billington v. Cotner*, 37 Ohio St.2d 17, 305 N.E.2d 805 (1974), syllabus.

{¶ 123} As to the City's first argument, the trial court commented that Mack had submitted a letter to Toledo's law director giving a full description of the issues and adequate time to decide whether to file suit. The trial court further said that the City obviously was not going to file suit. January 3, 2019 Order, pp.1-2.

{¶ 124} In situations where the plaintiff taxpayer failed to give the law director a written request before they filed suit, the Supreme Court has said that the question is "Did

the circumstances here show that it would have been unavailing to have made a request upon the solicitor[?]" *State ex rel. Nimon v. Village of Springdale*, 6 Ohio St.2d 1, 6, 215 N.E.2d 592 (1966). In that case, the court concluded that a request to bring suit in face of the facts would have been futile, as "[t]he lines were drawn, an unalterable stand was made, and the gauntlet was thrown down." *Id.*

{¶ 125} In the case before us, Appellees set out their position in detail in an October 23, 2017 letter to the City's law director, Adam Loukx, and asked Loukx to file suit. Appellees further indicated that if Loukx did not file suit by October 30, 2017, they would apply for an injunction in a court of competent jurisdiction. Loukx received the letter on October 23, 2017. Joint Stipulations, No. 1 and Ex. A attached to No. 7, p. 4. Rather than filing suit, Loukx sent Appellees' attorney a letter on October 24, 2017, stating that his initial reading of the letter indicated that Appellees' arguments were "meritless." *Id.* at No. 1, Ex. B, p. 1. Loukx asked for additional time to research the issues, and said he would reply on or before November 7, 2017. *Id.* At that time, the initial deadline for property owners to obtain inspections and receive lead-safe certificates was June 30, 2018, or about seven months later. TMC 1760.15.

{¶ 126} Loukx did not file a complaint, nor did he apply for an injunction in response to the letter. *Id.* at No.3. Appellees then filed their complaint for permanent injunction on November 2, 2017. On November 15, 2017, the City filed a motion for an extension of time until January 1, 2018, to respond to the complaint, which was granted. Shortly thereafter, in responding to Appellee's previously-filed request to waive the security deposit, the City stressed that the lawsuit was meritless. In this regard, Toledo cited a November 20, 2017 editorial in the Toledo Blade. Among other things, the editorial

stated that "The Property Investor's Network has sued Toledo to stop the city's ordinance aimed at eliminating lead hazards in the city's aging rental housing stock and day care centers. The group may have handed resistant Toledo landlords a new reason to drag their feet about complying with the ordinance, but dedicated city and public-health officials have worked too hard on the program to let the lawsuit kill the lead-safe program."[19]

{¶ 127} Although Appellees did, in fact, send a written request as required by R.C. 733.59, it is clear that under *Nimon*, the lines had been drawn, and the City's law director had no intention of filing suit. Furthermore, suit needed to be filed and resolved as soon as possible, given the deadline for statutory compliance. Although several months were left for compliance, the process of obtaining inspections and obtaining the required lead-safe certificates would have taken a substantial amount of time. Accordingly, we agree with the trial court that Appellees were not precluded from obtaining attorney fees under R.C. 733.61.

{¶ 128} Toledo's second argument is that Mack was acting in her own behalf, not the public interest, and that she harmed public interest, rather than benefitting it. We disagree. While the ordinance's goal of preventing lead poisoning is a laudable goal, Appellees acted in the public's behalf by asking for broader enforcement. That they may have benefitted by decreasing the competitive edge of larger apartment complexes is beside the point. Moreover, the public received a benefit in that Toledo is precluded from enforcing an ordinance that has a poorly-worded definition of the persons who may be subject to the expense of compliance and fines for failing to comply. *Compare Hess*,

---

[19] http://opinion.toledoblade.com/Editorials/2017/11/20/Doomed-lead-law-challenge.html (accessed on December 3, 2019).

133 Ohio App.3d at 736, 729 N.E.2d 823. Certainly, a great deal of confusion (as well as the cost of future court actions challenging enforcement) has been avoided.

{¶ 129} The more pertinent question is whether an attorney fee award is appropriate, since Appellees have been defeated in part on the merits. R.C. 733.61 is phrased in the disjunctive: that the taxpayer had "good cause to believe that his allegations were well founded, or if they [the allegations] are sufficient in law." In *State ex rel. Harris v. Rubino*, 156 Ohio St.3d 296, 2018-Ohio-5109, 126 N.E.3d 1068, the requirements in R.C. 733.61 were described as follows:

> The plain and unambiguous language of R.C. 733.61 establishes two criteria to recover attorney fees as part of the costs of an action filed under R.C. 733.59. The first provision is a gatekeeping mechanism that requires a court to find *either* that the taxpayer had "good cause to believe" his complaint was "well founded" or that the complaint was "sufficient in law." If *either* finding is made, the court must issue an order as equity demands and the taxpayer is to be awarded his costs. Second, if a judgment is issued in the taxpayer's favor, the court may allow, "as part of the costs, a reasonable compensation for his attorney." The determination of what is "reasonable," then, establishes the amount, if any, a taxpayer is entitled to recover.

(Emphasis added.) *Rubino* at ¶ 22 (Kennedy, J., concurring in part and dissenting in part).[20]

{¶ 130} The trial court found that Mack had good cause to believe her allegations

---

[20] The dissent was not related to this point.

were well-founded. The City has not disputed this point, and Mack is entitled to her costs, since she satisfied this the threshold requirement.

{¶ 131} However, recovery under the second part of the inquiry depends on whether a judgment has been rendered in the taxpayer's favor. In that situation, the court has discretion to award costs, including attorney fees. Because the circumstances have changed and only a partial judgment has been rendered in Mack's favor, the trial court should reconsider the amount of fees, if any, that should be awarded. Accordingly, this part of the City's assignment of error is sustained in part and overruled in part, and this cause will be remanded to the trial court for a decision on what fees, if any, Mack should receive under R.C. 733.61.

{¶ 132} Based on the preceding discussion, we conclude that: (1) the District did not lack authority under R.C. 3709.281 to enforce the City's lead ordinance; (2) the agreement between the City and the District did not violate Article II, Section of the Ohio Constitution; (3) the City's lead ordinance did not violate equal protection by distinguishing among numbers of rental units to be covered; (4) the ordinance's definition of "Owner" did violate equal protection by rendering the ordinance's classifications irrational; and (5) Appellants are entitled to costs. However, because Appellants have only partially prevailed, the trial court must reconsider what attorney fees, if any, should be awarded.

### III. Conclusion

{¶ 133} Appellants' assignment of error is overruled in part and sustained in part. Accordingly, the judgment of the trial court is reversed in part and affirmed in part, and this cause is remanded to the trial court solely for consideration of whether Appellee,

Cheryl Mack, is entitled to recover fees under R.C. 733.61, and if so, to what extent.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

(Hon. Jeffrey M. Welbaum, Hon. Michael T. Hall, and Hon. Michael L. Tucker, Second District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.)

Copies sent to:

Andrew R. Mayle
Ronald J. Mayle
Jeffrey B. Charles
Kevin A. Pituch
Evy M. Jarrett
Tabitha Stearns
Heather L. Hall
Hon. Linda J. Jennings